UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLUESTAR GENOMICS,<br><br>        Plaintiff,<br><br>    v.<br><br>CHUNXIAO SONG and LUDWIG INSTITUTE FOR CANCER RESEARCH, LTD.,<br><br>        Defendants. | Case No. 21-cv-04507-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND DENYING MOTION TO SEAL**<br><br>Re: ECF Nos. 82, 83, 89 |

In an order dated March 25, 2022, the Court granted Plaintiff Bluestar Genomics' ("Bluestar") request to conduct limited jurisdictional discovery and stayed its determination as to whether it can exercise personal jurisdiction over Defendants Dr. Chunxiao Song and Ludwig Institute for Cancer Research ("Ludwig"). ECF No. 59. After conducting limited jurisdictional discovery, Bluestar filed the First Amended Complaint ("FAC"). ECF No. 81.

Now before the Court are two motions to dismiss the FAC. ECF Nos. 82, 83. Both Defendants move to dismiss the claims against them for lack of personal jurisdiction. In the alternative, Dr. Song moves to dismiss the claims against him based on *forum non conveniens*, and Ludwig moves to dismiss the claims against it under Rule 12(b)(6), improper venue, and *forum non conveniens*. For the reasons set forth below, the Court denies Dr. Song's motion to dismiss for lack of personal jurisdiction and *forum non conveniens*. The Court grants Ludwig's motion to dismiss for lack of personal jurisdiction and denies as moot the motions to dismiss it brings in the alternative.[1]

---

[1] The Court also denies as moot the motion to seal filed by Bluestar, ECF No. 89, because Dr. Song and Ludwig, the parties who designated the material subject to the motion as confidential, filed a statement that they do not oppose the filing on the public docket of the previously-redacted portions of the material subject to the motion to seal (i.e., Exhibits 4, 11, and 12 to the Declaration

United States District Court
Northern District of California

I.      **BACKGROUND**

A.      **Claims and procedural history**

The Court first provides an overview of Bluestar's claims and the procedural history of this action.  In the FAC, Bluestar asserts claims (1) against Dr. Song for breach of contract, breach of the implied covenant of good faith and fair dealing, and conversion, and (2) against Ludwig for intentional interference with contractual relations and conversion.  ECF No. 81.

All claims arise out of the alleged breach of a contract for consulting services between Bluestar and Dr. Song (the "Consulting Agreement"), which was executed on October 1, 2016, several months after Dr. Song began his employment as a principal researcher in June 2016 at the University of Oxford, in a branch funded by Ludwig.  As discussed in more detail below, the Consulting Agreement required Dr. Song to support the prosecution and development of Bluestar's intellectual property portfolio; to assign to Bluestar any work product and intellectual property rights he generated pursuant to the contract; and to refrain from accepting any work or any obligation from a third party that was incompatible with his obligations under the Consulting Agreement.  Dr. Song allegedly developed two technologies that facilitate the detection of cancer, which are described as the 5mC technology[2] and the TAPS technique[3] in the FAC.  *See* FAC ¶¶ 36-37, 46-49, 65.  Bluestar avers that those technologies (the "disputed technologies") are work product and intellectual property covered under the Consulting Agreement and that Dr. Song was, therefore, required under the contract to assign all rights and interest in the disputed technologies

_____

of Yi Zhang, ECF Nos. 89-2, 89-3, and 89-4, respectively).  *See* ECF No. 99.

[2] The 5mC technology involves labeling a modified form of cytosine called 5-methylcytosine ("5mC") in cell-free DNA via sequencing.  *See* FAC ¶¶ 41-45.  Dr. Song allegedly filed an application to patent the 5mC technology under the title "Selective Labeling of 5-Methylcytosine in Circulating Cell-Free DNA."  *See id.* ¶ 42.  This technology is disclosed in U.S. Patent Publication 2020/0224190.  *Id.* ¶ 6.

[3] The TAPS technique is also referred to as "TET assisted pyridine borane sequencing" in the FAC.  *See* FAC ¶ 47.  The TAPS technique allegedly is a method for identifying 5mC and 5hmC by combining TET oxidation and reduction by borane derivatives.  *See id.* ¶ 48.  Dr. Song allegedly filed an application to patent the TAPS technique under the title "Bisulfite-free base-resolution identification of cytosine modifications."  *See id.* ¶ 47 & Ex. 3, ECF No. 81-3.  This technique is disclosed in U.S. Patent Publication 2020/0370114.  FAC, Ex. 3, ECF No. 81-3.

United States District Court
Northern District of California

to Bluestar.

Bluestar alleges that Dr. Song breached the Consulting Agreement by pursuing patent applications as to the disputed technologies and assigning the rights and interest to them to Ludwig instead of Bluestar; by accepting terms of employment with Ludwig that conflicted with his obligations under the Consulting Agreement; and by interfering with the business of Bluestar by committing the alleged acts just described.  Bluestar alleges that these actions by Dr. Song also give rise to a separate claim for conversion because they interfered with Bluestar's ownership of the rights to the disputed technologies.  *Id.* ¶¶ 95-116, 124-31.  Bluestar also avers (1) that Ludwig intentionally interfered with the Consulting Agreement by employing Dr. Song to work under terms incompatible with his obligations under the contract and by having Dr. Song assign his rights in the disputed technologies to Ludwig; and (2) that Ludwig aided and abetted Dr. Song's conversion of the rights and interest to the disputed technologies by assisting Dr. Song with the preparation of patent filings, accepting Dr. Song's assignment of his rights and interest in the disputed technologies, and failing to return those rights to Bluestar, the allegedly rightful owner. *Id.* ¶¶ 117-31.

Bluestar filed the first iteration of the complaint on June 11, 2021, in which it asserted the same claims against Dr. Song and Ludwig discussed above.  ECF No. 1.  Dr. Song and Ludwig moved to dismiss the claims against them for lack of personal jurisdiction or, in the alternative, based on *forum non conveniens*.  ECF Nos. 31, 34.  In its opposition to these motions, Bluestar requested leave to conduct limited jurisdictional discovery.  ECF Nos. 36-4, 42.

On March 25, 2022, the Court issued an order holding that Bluestar had not made a prima facie showing that either Dr. Song or Ludwig had the requisite minimum contacts with California to permit this Court to exercise personal jurisdiction over them.  ECF No. 59.  In relevant part, the Court rejected Bluestar's arguments that the Court could exercise specific jurisdiction over Defendants merely because the alleged "effects" of their conduct were felt in California considering Bluestar's status as a resident of California, and because Dr. Song had entered into a contract with a California resident.  *See id.* at 14.  Instead of dismissing the complaint, the Court granted Bluestar's alternative request for limited jurisdictional discovery and deferred its

1    determination as to whether it could exercise personal jurisdiction over Defendants.  *Id.*  The

2    Court ordered the parties to meet and confer about the scope and duration of jurisdictional

3    discovery and to submit a proposal for the Court's review, and it allowed Defendants to re-file and

4    re-notice their motions to dismiss after the completion of jurisdictional discovery.  *Id.* at 20.

5         On April 11, 2022, the parties filed a stipulation as to the scope and duration of

6    jurisdictional discovery and the dates for filing and responding to an amended complaint

7    incorporating new information; the Court granted it on April 12, 2022.  *See* ECF No. 63.  The

8    agreed-upon jurisdictional discovery included document requests, interrogatories, and depositions.

9         On August 23, 2022, Bluestar filed the FAC, in which it asserts the claims against

10   Dr. Song and Ludwig discussed above.[4]  ECF No. 81.  Bluestar seeks a declaration that it is the

11   "true and lawful owner" of the right, title, and interest in and to the disputed technologies; an order

12   requiring Dr. Song and Ludwig to assign all rights and interest in the disputed technologies to

13   Bluestar; an order permanently enjoining Dr. Song from breaching the Consulting Agreement and

14   Ludwig from intentionally interfering with the same; damages; and punitive damages.  *Id.* at page

15   25.

16        The motions to dismiss now before the Court followed.  ECF Nos. 82, 83.  As noted, both

17   Defendants move to dismiss the claims against them for lack of personal jurisdiction.  In the

18   alternative, Dr. Song moves to dismiss the claims against him based on *forum non conveniens*, and

19   Ludwig moves to dismiss the claims against it under Rule 12(b)(6), improper venue, and *forum*

20   *non conveniens*.

21        **B.      Relevant allegations and evidence**

22        For the purpose of resolving Defendants' motions to dismiss for lack of personal

23   jurisdiction, the Court accepts uncontroverted allegations in the FAC as true.  The Court does not

24   accept as true allegations in the FAC that are controverted by affidavit or other admissible

25   evidence.  Any such contradictions are noted below.  To the extent that both sides presented

26

27   _____

     [4] Bluestar filed a redacted version of the FAC on August 15, 2022.  *See* ECF No. 79.  The Court's
28   analysis is based on the unredacted version of the FAC filed on August 23, 2022.  ECF No. 81.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   conflicting admissible evidence with respect to a particular fact, the Court resolves the conflict in

2   Bluestar's favor.

3           Plaintiff Bluestar is a Delaware corporation whose principal place of business was at all

4   relevant times in California.  FAC ¶¶ 12, 40.  Bluestar is engaged in the business of developing

5   liquid biopsy techniques for cancer assessment.  *Id.* ¶ 13.  Bluestar was founded by non-party Dr.

6   Stephen Quake, a professor of bioengineering and applied physics at Stanford University.  *Id.*

7   ¶ 21.

8           Defendant Ludwig is an international cancer research organization that operates multiple

9   cancer research branches.  *Id.* ¶¶ 8, 15.  Ludwig has filed evidence, which Bluestar does not

10  dispute, providing that Ludwig is a Swiss nonprofit corporation headquartered in New York and

11  that Ludwig's intellectual property team is located in New York.  *See* Olsson Decl. ¶¶ 1, 3, ECF

12  No. 31-1; Olsson Dep Tr. at 58, ECF No. 84-2; Olsson Dep. Tr. at 67-69, ECF No. 90-3.  Ludwig

13  filed evidence, which Bluestar does not dispute, providing that Ludwig funds research branches in

14  Europe and the United States, including at the University of Oxford and in San Diego, California.

15  Olsson Decl. ¶¶ 4-5, ECF No. 31-1.

16          Bluestar alleges that Defendant Dr. Chunxiao Song currently is an "Assistant Member of

17  the Ludwig Institute for Cancer Research, Nuffield Department of Medicine, University of

18  Oxford."  FAC ¶ 14.  Dr. Song declared, and Bluestar does not dispute, that he is a citizen of

19  China and a permanent resident of the United Kingdom, and that he abandoned his United States

20  permanent resident status in July 2020.  Song Decl. ¶¶ 1, 33, ECF No. 34-1.

21                  **1.      Dr. Song's work at Dr. Quake's laboratory at Stanford University**

22          Dr. Song was a post-doctoral researcher at the laboratory of Dr. Stephen Quake at Stanford

23  University from 2013 to 2016.  FAC ¶ 20.  Dr. Song declared, and Bluestar does not dispute, that

24  he completed his work with Dr. Quake in May 2016 and moved to the United Kingdom in June

25  2016.  Song Decl. ¶¶ 4, 6, ECF No. 31-2.  Bluestar alleges that, while Dr. Song was at Stanford

26  University, he and Dr. Quake jointly developed a specific method for labeling and detecting via

27  sequencing a modified form of cytosine called 5-hydroxymethylcytosine ("5hmC") in cell-free

28  DNA ("5hmc technology"); that method is disclosed in U.S. Patent No. 10,718,010 ("the Stanford

United States District Court
Northern District of California

1  patent").  FAC ¶¶ 2, 37-39.

2  **2.     Dr. Song's employment with the University of Oxford**

3  After Dr. Song completed his work at Stanford University, Dr. Song allegedly commenced

4  his employment as a principal investigator at the University of Oxford ("the University" or

5  "Oxford").  *Id.* ¶ 23.  Dr. Song and Ludwig filed evidence pertaining to Dr. Song's employment

6  with the University of Oxford, which Bluestar has neither objected to nor contradicted with

7  evidence of its own.  It shows that, on June 13, 2016, Dr. Song entered into an employment

8  contract with the University of Oxford.  Song Decl. ¶¶ 1, 5, ECF No. 31-2; Song Decl. ¶ 1, ECF

9  No. 34-1.  That employment contract states that Dr. Song's employment is "with the University of

10  Oxford."  *See* Olsson Decl., Ex. 3, ECF No. 31-1 at 20.  It also states that Dr. Song's employment

11  with the University is "full-time" and that Dr. Song's "Department" at the University is the

12  "Ludwig Institute for Cancer Research, Target Discovery Institute."  *Id.*  Ludwig filed evidence,

13  which Bluestar has not disputed, providing that Ludwig's research branch at the University of

14  Oxford is "funded by Ludwig" but "all research staff at [Ludwig's Oxford] Branch are employees

15  of [the University of] Oxford and are paid by Oxford, not Ludwig."  Olsson Decl. ¶ 8, ECF No.

16  31-1.

17  **3.     Dr. Song's alleged employment or affiliation with Ludwig**

18  Bluestar alleges that Ludwig is "Dr. Song's employer," FAC ¶ 119, and that Dr. Song

19  "works or worked as an Assistant Member at the Ludwig Institute for Cancer Research, Oxford

20  Branch, in a group that developed epigenetic technologies and applied them in tumor biology," *id.*

21  ¶ 23.  Bluestar has not alleged or pointed to evidence that shows the terms of Dr. Song's alleged

22  employment with Ludwig.  Bluestar has not alleged or otherwise shown when and where Dr. Song

23  and Ludwig allegedly negotiated, or when and where Dr. Song allegedly accepted, the terms of his

24  alleged employment with Ludwig.

25  Bluestar avers that "Dr. Song holds or held himself out as an Assistant Member of

26  Ludwig," *id.* ¶ 23, and that, as an assistant member of Ludwig, "Dr. Song represented Ludwig,"

27  *id.* ¶ 90.  Bluestar does not allege facts or otherwise point to evidence indicating what it means for

28  Dr. Song to be an assistant member of Ludwig or for Dr. Song to represent Ludwig.

United States District Court
Northern District of California

Notably, the limited jurisdictional discovery that the Court authorized included depositions and requests for documents and interrogatories on the topics of "the terms of" Dr. Song's relationship with Ludwig, whether formal or informal; any agreements between Dr. Song and Ludwig; the "scope of work that Dr. Song was intended to perform on behalf of, funded by, or otherwise supported by Ludwig"; Dr. Song's "status" as assistant member of Ludwig; and the terms of Ludwig's relationship with the University of Oxford as it relates to Dr. Song. *See* ECF No. 63 at 1-4.

### 4.    Discussions as to the founding of the company that became Bluestar

Bluestar does not allege the date when Bluestar was formed.  Bluestar avers that, before Dr. Song left California to work at the University of Oxford, Dr. Song planned or discussed with Dr. Quake in California forming "what became Bluestar," and that Dr. Song and Dr. Quake met with investors and Stanford University staff in California in connection with the formation of the company that became Bluestar.  *See* FAC ¶¶ 53-54.  Dr. Song testified that he did not have a belief one way or the other whether he discussed with Dr. Quake in California the idea of starting a company together.  Song Dep. Tr. at 13-14, ECF No. 86-2.  Because Dr. Song's testimony on this issue was equivocal, the Court accepts Bluestar's allegations that Dr. Song participated in discussions relating to the formation of the company that became Bluestar as uncontroverted and, therefore, as true.

### 5.    The Consulting Agreement

Bluestar alleges that "Dr. Song agreed to a contract with Bluestar that cemented his involvement with the founding of this start-up company," with that contract being the Consulting Agreement.  FAC ¶¶ 3, 24, 53-54.  These allegations imply that the alleged discussions in California involving Dr. Song relating to the formation of the company that became Bluestar, discussed above, involved discussions about the Consulting Agreement and its terms.  However, Dr. Song testified that he first learned of Bluestar after he had moved to the United Kingdom and that he was asked to become involved in Bluestar in September 2016, when Dr. Quake emailed him to introduce him to Bluestar's then-CEO.  Song Dep. Tr. at 12-13, ECF No. 86-2.  Dr. Song declared that Dr. Quake contacted him at that time about "assisting" Bluestar "on a part-time basis

7

as a consultant." Song Decl. ¶ 8, ECF No. 34-1. Dr. Song testified that, after Dr. Quake introduced him to Bluestar's then-CEO, Dr. Song talked with the CEO prior to entering into the Consulting Agreement. *See* Song Dep. Tr. at 13-15, ECF No. 86-2. Dr. Song declared that he negotiated the terms of and entered into the Consulting Agreement when he was in the United Kingdom. Song Decl. ¶ 8, ECF No. 34-1. Because Bluestar does not point to any evidence to contradict Dr. Song's testimony that discussions and negotiations about the Consulting Agreement and its terms began in September 2016, when Dr. Quake initiated them and when Dr. Song was already residing in the United Kingdom, the Court credits Dr. Song's undisputed testimony on that point.

On October 1, 2016, Dr. Song entered into the Consulting Agreement with Bluestar. *See* ECF No. 81-9 at 2. The Consulting Agreement provides that the contract would terminate after one year, on October 1, 2017, subject to renewal by mutual agreement of the parties. *Id.* at 3. In August 2018, Bluestar and Dr. Song executed an amendment to the Consulting Agreement, effective as of October 1, 2017, which extended indefinitely the term of the Consulting Agreement until either party terminated it with or without cause by providing written notice of fifteen days. *See* ECF No. 81-10. Bluestar alleges that the Consulting Agreement remained in force until "at least in or around December 2019." FAC ¶ 33. However, that allegation is contradicted by Dr. Song's declaration, which provides that he gave notice to Bluestar of his termination of the Consulting Agreement in April 2019. Song Decl. ¶ 30, ECF No. 34-1. Bluestar has not pointed to any evidence to contradict Dr. Song's declaration on this point. Accordingly, the Court accepts Dr. Song's testimony that the Consulting Agreement terminated in approximately April 2019.

The Consulting Agreement provides that it "shall be governed by the laws of the United States of America and the laws of the State of California[.]" ECF No. 81-9 at 3. The agreement does not contain a forum-selection clause.

The Consulting Agreement required Dr. Song to spend "up to" 40 hours per month performing the following services for Bluestar, which include supporting the development of Bluestar's intellectual property portfolio and the intellectual property covered by the Stanford patent:

1. Provide technical support and continuity on translating the technology into protocols aiding the transfer of the NGS test from Steve Quake's to Jackson Lab or another site.

2. Consult in developing modifications and enhancements to the current technology workflow reflecting the new location and integration with other existing liquid biopsy workflows and technologies.

3. Assist in developing the studies program and strategy (technical, analytical and clinical), including identification of key disease indications and collaborators, coordinating on initial contact.

4. Perform critique and analysis of our new and past datasets from our epigenetic and sequencing studies, with a view towards future products and supporting publications.

5. Continue to support the prosecution and development of the Bluestar intellectual property portfolio, including the Stanford patent applications.

ECF No. 81-9 at 5.

Bluestar was required to pay Dr. Song $5,000 per month for "up to" 40 hours of work per month and to reimburse Dr. Song for any pre-approved travel expenses. *Id.* at 5. Bluestar agreed that it would, subject to approval by the company's board of directors, grant Dr. Song an option to purchase shares of the company's common stock, which would vest over 36 months. *Id.* The contract states that Dr. Song's relationship with Bluestar "is that of an independent contractor" and that "nothing in this Agreement is intended to, or should be construed to, create a partnership, agency, joint venture or employment relationship." *Id.* at 2.

In addition, the contract required Dr. Song to assign to Bluestar the rights to any work product that he generated or contributed to pursuant to the Consulting Agreement. *Id.* at 2. It also required Dr. Song to not "accept work, enter into a contract, or accept an obligation from any third party, inconsistent or incompatible with [his] obligations, or the scope of services rendered for [Bluestar], under this Agreement." *Id.* at 3. In addition, the Consulting Agreement provided that "[d]uring this [Consulting] Agreement, and for a period of one year immediately following its termination, [Dr. Song] agrees not to interfere with the business of [Bluestar] in any manner." *Id.*

### 6.        Performance of the Consulting Agreement

Bluestar alleges that, while the Consulting Agreement was in effect, Bluestar paid

1    Dr. Song "at least $5,000 every month which covered up to 40 hours of Dr. Song's consulting

2    services." FAC ¶ 60. Dr. Song testified that he received all payments from Bluestar in connection

3    with the Consulting Agreement in a bank account he opened in Palo Alto, California, in 2016,

4    before he left California to work for the University of Oxford. Song Dep. Tr. at 77-80, ECF No.

5    86-2. He also received royalties from the Stanford patent in that bank account. *Id.*

6    Bluestar alleges that Dr. Song received an ownership interest in Bluestar and still holds

7    that interest today. FAC ¶ 56. Dr. Song testified that he did not negotiate for an ownership stake

8    in Bluestar with anyone at Bluestar, that he was just given the stock by the then-CEO of Bluestar,

9    and that he does not know if he still has the stock because it was "very little." *See* Song Dep. Tr.

10   at 29-31, ECF No. 86-2. Bluestar's CEO declared that Dr. Song received an "equity fee" in

11   "return for Dr. Song's consulting services," namely 121,255 shares of Bluestar's common stock,

12   which are fully vested and constitute about 0.54% ownership interest in Bluestar. Levy Decl. ¶¶

13   3-4, ECF No. 42-1. To the extent that there is a conflict between Dr. Song's testimony pertaining

14   to the Bluestar common stock he received, and Bluestar's evidence on that point, the Court accepts

15   Bluestar's version for the purpose of resolving the present motions.

16   Bluestar alleges that, while the Consulting Agreement was in effect, Dr. Song supported

17   the development of technology at Bluestar relating to the Stanford patent and had standing weekly

18   calls and frequent emails with Bluestar employees and executives in California. FAC ¶¶ 58, 59.

19   Dr. Song declared that his consulting work "consisted almost entirely of emails and video calls

20   with Bluestar employees," which he conducted from Oxford, England. Song Decl. ¶ 4, ECF No.

21   50-1. Because Bluestar does not point to any evidence to contradict Dr. Song's testimony as to the

22   location from which he performed "most" of his consulting work, the Court credits Dr. Song's

23   testimony on that issue.

24   Bluestar alleges that, in 2018, Dr. Song traveled to Bluestar's offices in California twice, at

25   Bluestar's expense, and performed work for Bluestar pursuant to the Consulting Agreement. FAC

26   ¶¶ 61-64. Dr. Song declared, and Bluestar points to no evidence to dispute, that each of those trips

27   to California lasted two days. *See* Song Decl. ¶ 24, ECF No. 34-1. The first trip took place in

28   May 2018; Dr. Song visited Bluestar's San Diego office, met with Bluestar employees, and

discussed the disputed technologies with them.  *Id.* ¶¶ 61-62.  Bluestar alleges that, during this visit, Dr. Song acted "in his capacity as a Ludwig representative" when he discussed the disputed TAPS technique, Ludwig's potential licensing of the patent rights to the disputed technologies to Bluestar (discussed in more detail below), and related sponsored research agreements between Ludwig, the University of Oxford, and Bluestar.  *Id.* ¶¶ 67, 91.  The second trip took place in June 2018; Dr. Song visited Bluestar's office in San Francisco, met with Bluestar employees, and discussed the disputed technologies with Bluestar.  *Id.* ¶ 64.

Dr. Song declared, and Bluestar does not dispute, that he also traveled to other locations to perform services under the Consulting Agreement in 2017 and 2018, including France and Connecticut.  Song Decl. ¶¶ 9, 10, 27, ECF No. 34-1.

### 7.    Assignments of the rights to the disputed technologies

Bluestar alleges that Dr. Song developed the disputed 5mC technology as part of his consulting work pursuant to the Consulting Agreement.  *See* FAC ¶¶ 41-46.  Bluestar avers that, rather than assigning his rights and interest to the 5mC technology to Bluestar as required under the Consulting Agreement, Dr. Song assigned them to Ludwig.  *Id.* ¶¶ 46, 105.  Dr. Song and Ludwig filed evidence, which Bluestar has not controverted, showing (1) that all rights to the 5mC technology were assigned by Dr. Song and another co-inventor to the University of Oxford, not Ludwig, on February 15, 2018, *see* Song Decl. ¶ 17 & Ex. A, ECF No. 34-1; Getz Decl. ¶ 10, ECF No. 84 & Getz Decl., Ex. 5, ECF No. 84-5; and (2) that the University of Oxford subsequently assigned all rights to the 5mC technology to Ludwig on September 6, 2018, *see* Song Decl. ¶ 17 & Ex. A, ECF No. 34-1; Getz Decl., Ex. 6, ECF No. 84-6.

Bluestar alleges that, in January 2018, Dr. Song sought patent protection for the second disputed technology, the TAPS technique.  FAC ¶¶ 47-48.  Bluestar avers that the disputed TAPS technique belongs to Bluestar pursuant to the Consulting Agreement, because TAPS "pertains to a modification and enhancement" of the 5hmC technology covered by the Stanford patent.  *Id.* ¶¶ 47-49.  Bluestar also avers that Dr. Song breached the Consulting Agreement by "assign[ing]" in August 2018 "the rights in TAPS to Ludwig" instead of Bluestar.  *Id.*  However, Dr. Song and Ludwig filed evidence, which Bluestar has not disputed, showing (1) that all rights to the TAPS

technique were assigned by Dr. Song and another co-inventor to the University of Oxford, not Ludwig, on November 28, 2018, *see* Song Decl. ¶ 17 & Ex. A, ECF No. 34-1; Getz Decl. ¶ 12, ECF No. 84 & Getz Decl., Ex. 7, ECF No. 84-7; and (2) that the University of Oxford subsequently assigned all rights to the TAPS technique to Ludwig on January 7, 2019, *see* Song Decl. ¶ 17 & Ex. A, ECF No. 34-1; Getz Decl., Ex. 8, ECF No. 84-8.

Bluestar does not allege or otherwise show that any of the patent filings or assignments of the rights to the disputed technologies took place in California or involved contacts with California.  Bluestar alleges that "Ludwig's IP team, including Par Olsson, controlled the patent activities" for the disputed technologies as well as the "patenting process for the patent rights at issue."  FAC ¶ 92.  Ludwig filed evidence, which Bluestar does not dispute, showing that Ludwig's intellectual property team and Par Olsson work in Ludwig's offices in New York.  Olsson Decl. ¶ 1, ECF No. 31-1; *see also* Olsson Dep. Tr. at 67-69, ECF No. 90-3.

### 8.   Dr. Song's contacts with Ludwig's branch in San Diego, California

Bluestar alleges that, in November 2016, Dr. Song "was invited" by Ludwig to attend a conference in San Diego, California, and the trip was paid for by Ludwig.  FAC ¶ 82.  Bluestar argues in its opposition brief that Ludwig "sent" Dr. Song to California to attend this conference, ECF No. 90 at 11, but that fact is not alleged in the FAC.  At the conference, Dr. Song allegedly presented the technology covered by the Stanford patent, as well as his research plan for the disputed 5mC technology.  *Id.*

Also in 2016, Dr. Song allegedly "collaborated" on and discussed with Miao Yu, a researcher who worked at the laboratory of Dr. Bing Ren at Ludwig's San Diego branch, "work related to" the 5mC and TAPS disputed technologies.  *Id.* ¶¶ 84-87.  Specifically, Dr. Song allegedly discussed with Yu "an important component of TAPS" called TET as part of his development of the 5mC and TAPS disputed technologies.  *Id.* ¶¶ 85-87.  Dr. Song does not dispute that he discussed at least one form of TET with Miao Yu.  Song Dep. Tr. at 101-119, ECF No. 86-2.  Bluestar alleges that Dr. Song "was acting for Ludwig" in connection with this alleged discussion and collaboration in 2016.  FAC ¶ 90.

In May 2018, Dr. Song allegedly reached out to a member of Ludwig's San Diego branch,

United States District Court
Northern District of California

Dr. Bing Ren, to provide protocols to him so that he could use the disputed TAPS technique in California.  *Id.* ¶ 88.  Bluestar alleges that "Dr. Song was acting in his capacity as a Ludwig representative when he offered to provide protocols to Dr. Ren's Ludwig laboratory in California to use the TAPS technology."  *Id.* ¶ 93.  Dr. Song does not dispute that he provided the TAPS protocols to Dr. Ren, but he testified that, at the time he shared the protocols, the TAPS technique had already been published.  Song Dep. Tr. at 122, ECF No. 86-2.

### 9.        Licensing of the patent rights to the disputed technologies

Bluestar alleges that, in February 2018, it attempted to "amicably confirm rights" to the disputed technologies by attempting to license the patent rights to the disputed technologies from Ludwig.  FAC ¶ 65.  In its opposition, Bluestar implies that it sought to resolve the dispute that gives rise to the claims in this action, which arises out of the assignment of the ownership rights to the disputed technologies to Ludwig, by seeking a licensing agreement with Ludwig.  ECF No. 90 at 10.  However, Ludwig filed evidence showing that its licensing discussions with Bluestar about the disputed technologies were not intended to resolve a dispute about the ownership rights to the disputed technologies because, prior to the filing of this lawsuit in June 2021, nobody at Bluestar ever claimed to Ludwig that Bluestar had an ownership interest in the disputed technologies.  *See* Olsson Decl. ¶ 32, ECF No. 31-1.  Bluestar does not point to evidence showing that it ever claimed to Ludwig prior to the filing of this lawsuit that it was the rightful owner of the rights to the disputed technologies.[5]

Bluestar alleges that, in October 2018, "after diligent negotiations between Ludwig and Bluestar, Ludwig and Bluestar reached an option and license agreement.  In light of the agreement, Bluestar executed the option agreement with a term sheet, which Ludwig did not sign."  FAC ¶ 70.  Bluestar alleges that Ludwig declined to sign the option and license agreement because Dr. Song

---

[5] The only evidence that Bluestar cites is the declaration of Bluestar's current CEO, Samuel Levy, which states that, "[w]hile not conceding that the disputed technology did not belong to Bluestar, Bluestar sought to negotiate a licensing agreement with Ludwig to resolve a contract dispute without involving the courts."  *See* Levy Decl. ¶ 21, ECF No. 36-6.  This declaration does not show that Bluestar ever claimed to Ludwig, prior to the filing of this lawsuit, that Bluestar was the rightful owner of the disputed technologies.

United States District Court
Northern District of California

"redirected Ludwig" to license the patent rights to the disputed technologies to "his own startup," which is called Base Genomics. FAC ¶¶ 72-76. Bluestar alleges that Base Genomics is a spinoff from Oxford Sciences Innovation, an investment firm created to spin out companies at the University of Oxford. *Id.* ¶ 72. Dr. Song filed evidence, which Bluestar does not dispute, indicating that Base Genomics was formed in Oxford, England. Song Decl. ¶¶ 31-32, ECF No. 34-1; Olsson Decl. ¶¶ 29-30. Bluestar avers that, in May 2019, "[a]s part of his effort to deprive Bluestar of its rightful interest in the 5mc and TAPS technology," Dr. Song traveled to California at Base Genomics' expense to solicit and secure investment for Base Genomics. FAC ¶¶ 77-80.

## II.   SUBJECT MATTER JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1332.

## III.   PERSONAL JURISDICTION

### A.   Legal Standard

"In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Where "the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citation and internal quotation marks omitted). In other words, "if a plaintiff's proof is limited to written materials, it is necessary only for these materials to demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss." *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977). "Although the plaintiff cannot simply rest on the bare allegations of its complaint, uncontroverted allegations in the complaint must be taken as true." *Schwarzenegger*, 374 F.3d at 800 (internal quotation marks and citations omitted). "Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Id.*

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). "California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S.

1    Constitution." *Id.*; *see also* Cal. Code Civ. Proc. § 410.10 ("A court of this state may exercise

2    jurisdiction on any basis not inconsistent with the Constitution of this state or of the United

3    States."). Because the applicable state "statute is coextensive with federal due process

4    requirements, the jurisdictional analyses under state law and federal due process are the same." *In*

5    *re Boon Glob. Ltd.*, 923 F.3d 643, 650 (9th Cir. 2019) (citation and internal quotation marks

6    omitted).

7           Due process "requires that each party 'have certain minimum contacts' with the forum

8    state 'such that the maintenance of the suit does not offend traditional notions of fair play and

9    substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "The

10   strength of contacts required depends on which of the two categories of personal jurisdiction a

11   litigant invokes: specific jurisdiction or general jurisdiction." *Ranza v. Nike, Inc.*, 793 F.3d 1059,

12   1068 (9th Cir. 2015). "A court with general jurisdiction may hear any claim against that

13   defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-*

14   *Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1780 (2017) (emphasis in original). General

15   jurisdiction over a corporation is appropriate only when the corporation's contacts with the forum

16   state "are so 'continuous and systematic' as to render [it] essentially at home in the forum State."

17   *Daimler AG*, 571 U.S. at 127 (citation omitted).

18          "Specific jurisdiction is very different." *Bristol-Myers*, 137 S. Ct. at 1780. For the court to

19   exercise specific jurisdiction, the lawsuit must arise out of or relate to the defendant's contacts

20   with the forum. *Id.* "In other words, there must be an affiliation between the forum and the

21   underlying controversy, principally, [an] activity or an occurrence that takes place in the forum

22   State and is therefore subject to the State's regulation." *Id.* (citation and quotation marks omitted).

23   "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the

24   very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v.*

25   *Brown*, 564 U.S. 915, 919 (2011) (citation and internal quotation marks omitted).

26          **B.       Discussion**

27          Bluestar argues that the Court can exercise specific jurisdiction over Dr. Song and

28

15

Ludwig.[6]  The Ninth Circuit has established a three-part test for analyzing whether a court can exercise specific jurisdiction over a defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (citation omitted).  "The plaintiff bears the burden of satisfying the first two prongs of the test.  If the plaintiff fails to satisfy either of these prongs, personal jurisdiction is not established in the forum state.  If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (citations omitted).

Because the exercise of personal jurisdiction "depends only upon each defendant's relationship with the forum," *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990), the Court analyzes the contacts of Dr. Song and Ludwig to determine whether they satisfy the three-part test for specific jurisdiction.

### 1. Dr. Song

#### a. Purposeful availment

Under the first prong of the specific jurisdiction test, a plaintiff must establish that the defendant "either purposefully availed itself of the privilege of conducting activities in California, or purposefully directed its activities toward California." *Schwarzenegger*, 374 F.3d at 802.  A purposeful availment analysis "is most often used in suits sounding in contract," while a purposeful direction analysis "is most often used in suits sounding in tort." *Id.*

Here, the claims that Bluestar asserts against Dr. Song are for breach of contract, breach of

---

[6] Bluestar does not contend that the Court can exercise general jurisdiction over either Dr. Song or Ludwig.

the implied covenant of good faith and fair dealing, and conversion.  Because these claims sound in contract, the Court will employ the purposeful availment test.  The parties agree that the purposeful availment test is the proper vehicle for analyzing Dr. Song's contacts with California. *See* ECF No. 88 at 7; ECF No. 83 at 10.

The purposeful availment test looks to whether there exists "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (citation and internal quotation marks omitted).  "[W]here the defendant 'deliberately' has engaged in significant activities within a State . . . or has created 'continuing obligations' between himself and residents of the forum . . . he manifestly has availed himself of the privilege of conducting business there[.]"  *Id.* (internal citations omitted).  The existence of a contract that will be performed by one of the parties in the forum state does not, on its own, "automatically establish sufficient minimum contacts in the other party's home forum[.]"  *Id.* at 479.  This is because a contract is only an intermediate step that connects prior negotiations with future consequences, which are the real object of a business transaction.  *Id.*  For that reason, where a defendant's contacts with the forum relate to a contract, courts consider factors that include "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."  *Id.*

Bluestar points to the following contacts that Dr. Song allegedly established with California in connection with the Consulting Agreement; Bluestar contends that these contacts support a finding that Dr. Song purposefully availed himself of the benefits of conducting business in California.

(1) Prior negotiations.  Bluestar alleges that, before Dr. Song left California to work at the University of Oxford, Dr. Song planned or discussed with Dr. Quake in California "what became Bluestar" and that Dr. Song and Dr. Quake met with investors and Stanford University staff in California to discuss the formation of the company that became Bluestar.  *See* FAC ¶¶ 53-54. However, undisputed testimony from Dr. Song established that the negotiations regarding *the Consulting Agreement* and its terms, which are the discussions that are relevant to the personal

jurisdiction analysis here, began in September 2016 when Dr. Quake contacted Dr. Song about assisting Bluestar on a part-time basis as a consultant.[7]  *See* Song Decl. ¶ 8, ECF No. 34-1; Song Dep. Tr. at 14-15, ECF No. 86-2.  Dr. Song was already residing in the United Kingdom in September 2016.  *See id.*

(2) Terms of the contract.  The Consulting Agreement was executed on October 1, 2016. *See* ECF No. 81-9 at 2.  It required Dr. Song to assist Bluestar in developing Bluestar's intellectual property portfolio, including the technologies covered by the Stanford patent.  *Id.* at 5.  Dr. Song was to perform up to 40 hours of work per month in exchange for $5,000 per month.  *Id.* at 5. Dr. Song could be reimbursed for travel-related expenses that were pre-approved by Bluestar.  *Id.* at 5.  The Consulting Agreement contains a choice-of-law provision providing that the agreement is governed by California law.  *Id.* at 3.  The August 2018 amendment to the Consulting Agreement stated that Bluestar's principal place of business was in San Francisco, California. ECF No. 81-10 at 2.

(3) The parties' actual course of dealing.  Bluestar alleges that Dr. Song's performance of his obligations under the Consulting Agreement involved weekly phone calls and emails with Bluestar employees who were in California.  FAC ¶¶ 24, 58-59.  Dr. Song declared, and Bluestar has offered no evidence to dispute, that Dr. Song made these phone calls and sent these emails from the United Kingdom.  Song Decl. ¶ 8, ECF No. 34-1.  Bluestar also alleges that Dr. Song visited Bluestar's offices in California twice at Bluestar's expense during which Dr. Song had discussions with Bluestar employees about matters covered under the Consulting Agreement. FAC ¶¶ 57-64.  Dr. Song opened a bank account in California before he left for the United Kingdom, and he received all payments from Bluestar pursuant to the Consulting Agreement in that account.  Song Dep. Tr. at 81-82, ECF No. 86-2.  In return for his consulting services, Dr. Song received 121,255 shares of Bluestar's common stock, which are fully vested and

---

[7] Dr. Song cited a case, which Bluestar has not distinguished, that holds that "it is only the dealings between the parties *in regard to the disputed contract* that are relevant to the minimum contacts analysis" under the purposeful availment framework.  *See Azzarello v. Navagility, LLC*, 2008 WL 4614667, at *4 (N.D. Cal. Oct. 16, 2008) (citation and internal quotation marks omitted) (emphasis added).

United States District Court
Northern District of California

1   constitute an approximately 0.54% ownership interest in Bluestar.  Levy Decl. ¶¶ 3-4, ECF No.

2   42-1.

3           (4) <u>Contemplated future consequences</u>.  The Consulting Agreement was originally

4   intended to expire within one year, on October 1, 2017, ECF No. 81-9 at 3, but in August 2018,

5   the parties executed an amendment that extended the contract's duration indefinitely, until one of

6   the parties terminated it with or without cause with a fifteen-day notice, ECF No. 81-10 at 2.  The

7   amendment was to be effective as of October 1, 2017.  *Id.*  Dr. Song declared that he notified

8   Bluestar of his intent to suspend the Consulting Agreement in April 2019.  Song Decl. ¶ 30, ECF

9   No. 34-1.  The Court assumes, based on Dr. Song's uncontroverted declaration, that the

10  Consulting Agreement was in effect until approximately April 2019.

11          Bluestar relies heavily on *Burger King* for the proposition that the foregoing is sufficient to

12  find that Dr. Song purposefully availed himself of the benefits of conducting business in

13  California.  In *Burger King*, the Supreme Court held that the defendants, who were residents of

14  Michigan, had purposefully availed themselves of the privilege of conducting business in Florida

15  by entering into a franchise agreement with Burger King headquarters in Florida for a franchise in

16  Michigan.  471 U.S. at 487.  The Florida plaintiff sued the defendants in Florida for breach of

17  contract and other claims, alleging that the defendants had failed to make payments required under

18  the franchise agreement to Burger King headquarters in Florida.  *Id.* at 468.  The Supreme Court

19  held that the Michigan defendants had sufficient contacts with Florida to justify a finding of

20  purposeful availment because they had created significant "continuing obligations" between

21  themselves and Florida by virtue of the franchise agreement, which was to last for twenty years

22  and "envisioned continuing and wide-ranging contacts with Burger King's Miami headquarters,"

23  as well as the "exacting regulation" of the defendants' Michigan franchise by Florida

24  headquarters.  *Id.* at 480-81.  The Supreme Court also held that, while the Florida choice-of-law

25  provision in the franchise agreement "standing alone would be insufficient to confer jurisdiction,"

26  "when combined with the 20-year interdependent relationship established with Burger King's

27  Miami headquarters, it reinforced [the defendants'] deliberate affiliation with the forum State[.]"

28  *Id.* at 482.

United States District Court
Northern District of California

The Court is not persuaded that it can find purposeful availment by Dr. Song based on *Burger King*.  The Consulting Agreement created continuing obligations between Dr. Song and Bluestar, but the business relationship created by the contract was not as interdependent and all-encompassing as the one in *Burger King*, which was to govern nearly every aspect of the defendants' franchise in Michigan for twenty years and required "wide-ranging contacts" with the plaintiff in the forum.  The Consulting Agreement did not require Dr. Song to subject himself or his business activities to exacting regulation by Bluestar over a twenty-year period.

Bluestar also relies on *T.M. Hylwa, M.D., Inc. v. Palka*, 823 F.2d 310 (9th Cir. 1987) ("*Palka*") to argue that Dr. Song purposefully availed himself of the benefits of conducting business in California.  There, the Ninth Circuit relied on *Burger King* to conclude that a court in California could exercise personal jurisdiction over a defendant who intentionally contracted to provide accounting services for a business in California.  The defendant was a resident of Kansas at all relevant times.  The plaintiff initially ran a medical practice in Kansas and hired the defendant to provide accounting services for the medical practice.  The plaintiff later moved to California and established a new medical practice there, and the defendant continued to provide accounting services for the new medical practice in California.  The defendant "performed most of the accounting services while at home in Kansas but traveled to California to work in [the plaintiff's] offices for seven to ten days during each June from 1981 to 1983, and in August 1983 he returned to California to work on [the plaintiff's] tax audit."  *Id.* at 312.  The plaintiff sued the defendant in California for breach of contract, negligence, and for an order declaring that the plaintiff did not owe the defendant certain retirement benefits.  The Ninth Circuit held that the California court could exercise personal jurisdiction over the Kansas defendant, reasoning that, "[b]y contracting to provide personal services after [the plaintiff] reincorporated in California, [the defendant] deliberately created 'continuing obligations' between himself and residents of the forum . . . [and] manifestly has availed himself of the privilege of conducting business there[.]"  *Id.* at 314 (quoting *Burger King*, 471 U.S. at 476).  The Ninth Circuit held that the defendant's limited physical presence in California did not preclude a finding of purposeful availment because the defendant had "'purposefully interjected' himself into California affairs by choosing to

United States District Court
Northern District of California

maintain an employer-employee relationship with a California-based corporation," *id.* at 315, and because he had intentionally decided to provide "ongoing . . . accounting services for a California enterprise" and to "benefit from the contractual relationship" even after the plaintiff moved to California, *id.* at 314.

*Palka* supports a finding of purposeful availment here because Dr. Song intentionally contracted to provide "ongoing" consulting services for a California corporation with no definite end date. As noted, the Consulting Agreement was amended in August 2018 to provide that it would continue indefinitely until terminated by either party. The August 2018 amendment indicates that Dr. Song intended to provide consulting services to, and to benefit from the contractual relationship with, a California resident on a long-term basis. The Consulting Agreement remained in effect for approximately 2.5 years, which is a similar duration to the contractual relationship in *Palka*, which lasted from 1981 to 1984. *See id.* at 314.

Dr. Song argues that *Palka* is distinguishable because the services that the defendant provided to the plaintiff there were full-time services that resulted in an employer-employee relationship, whereas the Consulting Agreement established an independent-contractor relationship for part-time consulting services. Dr. Song also argues that his visits to Bluestar in California were fewer and shorter than those of the defendant in *Palka*. Dr. Song visited Bluestar's offices in California twice, with each visit lasting two days; the defendant in *Palka* visited the plaintiff's offices in California a total of four times, with some of those visits lasting seven to ten days. *See id.* at 312.

Dr. Song's arguments are not persuasive. The Ninth Circuit's holding in *Palka* appears to have been driven primarily by the fact that the defendant intentionally decided to contract for the purpose of providing "ongoing" services to a California resident and benefitting from that relationship. There is no dispute here that Dr. Song intentionally contracted to provide "ongoing" consulting services to Bluestar and benefitted financially from the Consulting Agreement for multiple years. Thus, the primary basis for the finding of purposeful availment in *Palka* is present here also. It is true, as Dr. Song points out, that the facts here are not on all fours with *Palka* because the Consulting Agreement did not create an employer-employee relationship that required

21

periodic travel to California of seven to ten days at a time, as the contract in *Palka* did.  But these differences do not alter the Court's finding of purposeful availment (1) because the Ninth Circuit expressly noted in *Palka* that even an absence of physical presence in California would not preclude a finding of purposeful availment, *see id.* at 314, and (2) because Dr. Song created other connections with California that the defendant in *Palka* did not.  It is undisputed that Dr. Song received all payments from Bluestar pursuant to the Consulting Agreement in a bank account he set up in California.[8]  *See* Song Dep. Tr. at 80.  Further, the Consulting Agreement provides that it is governed by California law.  When considered in conjunction with Dr. Song's intentional decision to contract to provide "ongoing" consulting services to Bluestar with no definite end date, Dr. Song's use of his California bank account to conduct business with a California resident and his acceptance of a California choice-of-law provision support a finding that Dr. Song purposefully established an affiliation with California and availed himself of the privilege of conducting business here.

Dr. Song argues that he negotiated the Consulting Agreement when he was residing in the United Kingdom and that this counsels against finding purposeful availment.  However, under *Palka*, the location of the negotiations does not appear to be material.  In *Palka*, the Kansas defendant was residing in Kansas at all relevant times, presumably including when the contract at issue was negotiated, and the Ninth Circuit still found purposeful availment.

Dr. Song relies on *Picot v. Weston*, 780 F.3d 1206, 1213 (9th Cir. 2015), to argue that a finding of purposeful availment is not warranted.  That case is distinguishable.

---

[8] Dr. Song argues that he did not open or maintain the bank account for the purpose of receiving payments from Bluestar.  *See* ECF No. 91 at 10.  However, what matters for the purposeful availment analysis is that Dr. Song testified that he received all of his payments from Bluestar at the bank account he set up in California, as that indicates that Dr. Song used that bank account to conduct business with a California resident.  Dr. Song argues that a bank account is not a forum contact relevant to the purposeful availment analysis, but the authorities he cites to support that argument are inapposite, because they examine whether a defendant's transactions with a bank account *belonging to the plaintiff* could serve as forum contacts by the defendant.  *See* ECF No. 83 at 18 (citing *Michael v. New Century Fin. Servs.*, 65 F. Supp. 3d 797, 809 (N.D. Cal. 2014) and *S.H. Silver Co. Inc. v. David Morris Int'l*, No. C 08-03550 CRB, 2008 WL 4058364, at *4 (N.D. Cal. Aug. 28, 2008)).  Dr. Song has not cited any authority indicating that a defendant's use for business purposes of a bank account he set up in the forum is not a forum contact relevant to the purposeful availment analysis.

United States District Court
Northern District of California

In *Picot*, a California plaintiff entered into an *oral* contract with a Michigan defendant pursuant to which the defendant was to help develop and market certain technology in exchange for a share of any profits from the sale of the technology, $20,000 per month, and reimbursement of his expenses. *Id.* The agreement was allegedly formed in Michigan and was performed by the defendant in Michigan and by the plaintiff in California. The defendant traveled to California twice pursuant to the contract and was reimbursed by the plaintiff for those trips. The plaintiff eventually entered into a contract to sell the technology to a third party. When the plaintiff refused to pay the defendant his purported share of the proceeds from the third-party contract, the defendant threatened the third-party purchaser with a lawsuit, and the contract to sell the technology to the third party fell through. The plaintiff sued the Michigan defendant in California for a declaration that no oral agreement between him and the defendant ever existed and for intentional interference with the sales contract with the third party. In the context of the contract claim, the Ninth Circuit concluded that the "oral agreement and [the defendant's] two trips to California did not create sufficient minimum contacts to subject him to personal jurisdiction there."[9] *Id.* at 1213. It reasoned that, given "the limited nature of the transaction at issue," the defendant's two trips to California were insufficient to establish the requisite minimum contacts with California because the trips were not "envisioned in the initial oral agreement" and instead "grew incidentally out of broader efforts to develop and market the technology." *Id.* The Ninth Circuit also reasoned that the trips held "no special place in [the defendant's] performance under the agreement as a whole," given that the defendant also traveled to other locations pursuant to the contract and that "the bulk" of the defendant's efforts in connection with the alleged agreement "were centered in Michigan." *Id.*

Here, Dr. Song established more connections with California than the defendant in *Picot* did. In *Picot*, the defendant's two trips to California were his only contacts with the state. By

---

[9] *Picot* addresses contract claims as well as tort claims under the purposeful availment and purposeful direction frameworks, respectively. While *Picot*'s purposeful availment analysis does not help Dr. Song, its purposeful direction analysis is instructive and relevant to Ludwig's motion to dismiss, as discussed in more detail below.

contrast, Dr. Song, in addition to visiting Bluestar's offices in California twice, accepted all payments from Bluestar pursuant to the Consulting Agreement in the bank account he set up in California, and he agreed to a California choice-of-law provision. *Picot* is distinguishable for the additional reason that the Ninth Circuit considered the defendant's contacts with California in the context of "the limited nature of the transaction" between the California plaintiff and the Michigan defendant, which was to end when the technology was sold to a third party. *Id.* at 1213 (citing *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008)). Here, as discussed above, the parties amended the Consulting Agreement in August 2018 to allow the agreement to continue in effect indefinitely unless terminated by either party. Thus, the contract here did not involve a "limited" transaction with a definite end point, but rather created "ongoing obligations" to a California resident with no definite end date. *Cf. Boschetto*, 539 F.3d at 1017 (finding that a contract for the sale of a car was insufficient to create a substantial connection with California because it "did not create any ongoing obligations [with the plaintiff] in California," as "once the car was sold the parties were to go their separate ways").

Dr. Song's remaining argument is that the actions that he took to establish contacts with California (e.g., accepting business payments in a bank account he set up in California, entering into an agreement that contains a California choice-of-law provision, sending emails and making phone calls to Bluestar employees in California) are not, when considered individually, sufficient to find purposeful availment. But what drives the Court's finding here is the *totality* of Dr. Song's contacts with California. When considered together, as discussed above, his contacts are sufficient to find purposeful availment.

Accordingly, the first prong of the specific jurisdiction test is met.

### b. Arises out of or relates to the defendant's forum contacts

To determine whether a plaintiff satisfies the second prong of the three-part specific jurisdiction test, a court must examine whether the plaintiff's claims "arise out of or relate to the defendant's contacts with the forum." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 983 (9th Cir. 2021) (citation omitted).

In *Palka*, the case discussed above involving a contract for accounting services, the Ninth

United States District Court
Northern District of California

1   Circuit held that the second prong of the specific jurisdiction test was satisfied because the claim

2   for breach of contract that the California plaintiff asserted against the Kansas defendant arose out

3   of the defendant's alleged failure to fully perform his duties as an accountant and, as such, arose

4   "directly out of [the defendant's] forum contacts with California via his employment relationship

5   with [the California plaintiff]."  *See* 823 F.2d at 315.  In so holding, the Ninth Circuit did not

6   inquire into the location of the alleged breach of the contract.  Instead, in finding the requisite

7   nexus, the Ninth Circuit relied on the claim's relationship to the contractual relationship as a

8   whole and the contacts that the defendant had established with California by virtue of that

9   contractual relationship.  *Id.* at 314-15.

10      Bluestar's claims against Dr. Song arise out of an alleged breach of the Consulting

11   Agreement and, as such, they arise out of or relate to Dr. Song's contacts with California via his

12   contractual relationship with Bluestar in California.  Bluestar's claims are, therefore, related under

13   *Palka* to the California contacts that Dr. Song established with California pursuant to that

14   relationship.  Dr. Song has not even attempted to distinguished *Palka* on that point.  *See* ECF No.

15   91 at 15-16.  This is sufficient to find the requisite nexus under the second prong of the specific

16   jurisdiction test.

17      Dr. Song argues that but-for causation is required to establish the requisite nexus between

18   Bluestar's claims and his California contacts.  In other words, Dr. Song contends that the requisite

19   nexus cannot be established unless Bluestar shows that its claims would not have arisen but for

20   Dr. Song's contacts with California.  The Ninth Circuit has clarified that "but for" causation is not

21   required to establish the nexus for the second prong of the specific jurisdiction test in light of *Ford

22   Motor Co. v. Montana Eighth Judicial District*, 141 S. Ct. 1017, 1026 (2021) ("*Ford*").  *Ford*

23   holds that the phrase "relates to" contemplates that "some relationships will support jurisdiction

24   without a causal showing."[10]  *See Ayla*, 11 F.4th at 983 n.5 ("We clarify [in light of *Ford*] that our

25

26   [10] In its opposition to Dr. Song's first motion to dismiss for lack of personal jurisdiction, Bluestar
    argued that, "[i]n determining whether a plaintiff's claims arise out of the defendant's forum-
27   related activities, the Ninth Circuit applies a 'but-for' test."  *See* ECF No 42 at 15.  Accordingly,
    in its order of March 25, 2022, the Court employed a but-for test to determine whether Dr. Song's
28   contacts with California satisfied the second prong of the specific jurisdiction test.  ECF No. 59 at
    11.  Dr. Song argues that the Court should apply the but-for test once again to resolve his present

precedents permit but do not require a showing of but-for causation to satisfy the nexus requirement" of the specific jurisdiction test).  Because but-for causation is not required to satisfy the second prong, Dr. Song's argument fails.

In light of the foregoing, the second prong of the specific jurisdiction test is satisfied.

### c.   Reasonableness

Because Bluestar has met its burden of establishing the first two prongs of the specific jurisdiction test, personal jurisdiction is presumptively reasonable and the burden shifts to Dr. Song to "present[] a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Palka*, 823 F.2d at 315.  "Determining reasonableness is not an abstract exercise but must be approached with flexibility and must focus on the circumstances of a given case."  *Ins. Co. of N. Am. v. Marina Salina Cruz*, 649 F.2d 1266, 1273 (9th Cir. 1981) ("*Marina*").

To evaluate reasonableness, the Court must consider and balance the following factors: "(1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum."  *Freestream Aircraft (Berm.) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 607 (9th Cir. 2018).  "No one of the factors is dispositive in itself.  Instead, [courts] are to balance all seven."  *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1132 (9th Cir. 2003).

(1) Extent of interjection into California.  "Even if there is sufficient 'interjection' into the state to satisfy the [purposeful availment prong], the degree of interjection is a factor to be weighed in assessing the overall reasonableness of jurisdiction under the [reasonableness prong]."  *See Marina*, 649 F.2d at 1271.  "The smaller the element of purposeful interjection, the less is

---

motion.  The Court declines to do so given the Ninth Circuit's clarification in *Ayla* that but-for causation is not required.

United States District Court
Northern District of California

1    jurisdiction to be anticipated and the less reasonable is its exercise." *Id.*  As discussed above,

2    Dr. Song's contacts with California are sufficient to find purposeful availment under *Palka*, but

3    they are not as extensive as the contacts in *Burger King*.  Accordingly, the Court finds that this

4    factor weighs in favor of exercising personal jurisdiction over Dr. Song, but not heavily.

5            (2) <u>Burden on Dr. Song</u>.  In considering the burden that litigating in California would

6    impose on Dr. Song, the Court must give "significant weight" to the "unique burdens placed upon

7    one who must defend oneself in a foreign legal system . . .  in assessing the reasonableness of

8    stretching the long arm of personal jurisdiction over national borders."  *Asahi Metal Indus. Co. v.*

9    *Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 114 (1987).

10           Dr. Song argues that it would be burdensome for him to have to defend himself against

11   Bluestar's claims in California because he is a Chinese citizen and permanent resident of the

12   United Kingdom; he is an employee of the University of Oxford and conducted "all the research

13   and made all the discoveries at issue in this case in an Oxford lab"; and because he abandoned his

14   United States permanent resident status in 2020 and has no ongoing connections to California or

15   the United States.  ECF No. 83 at 21-22; ECF No. 91 at 17-18.  Dr. Song does not provide any

16   detail as to the nature or extent of the burden he would have to endure if he were forced to defend

17   himself in California.

18           Dr. Song relies on *Core-Vent Corp. v. Nobel Indus. AB*, for the proposition that his lack of

19   ongoing connections to the United States is sufficient for the Court to find that the burden factor

20   weighs strongly against exercising personal jurisdiction over him.  *See* 11 F.3d 1482, 1488 (9th

21   Cir. 1993), *modified on other grounds by Yahoo! Inc. v. La Ligue Contre Le Racisme Et*

22   *L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006).  In *Core-Vent*, the Ninth Circuit held that the

23   burden factor weighed "heavily" against exercising personal jurisdiction over four Swedish

24   doctors who were sued for libel in California by an international corporation.  *Id.* at 1489.  This

25   was because the Swedish doctors were "individuals with little or no physical contacts with

26   California" and "ha[d] no ongoing connection to or relationship with the United States."  *Id.* at

27   1488-89.  The doctors had visited California in the past but those visits were limited to not more

28   "than a few times on random occasions" unrelated to the libel claims against them.  *Id.* at 1483-84.

United States District Court
Northern District of California

Bluestar contends that the Court cannot rely on *Core-Vent* to find that the burden factor weighs heavily in Dr. Song's favor because Dr. Song established more contacts with California and the United States than the Swedish doctors in that case and some of those contacts are ongoing. Bluestar argues that Dr. Song collected his payments pursuant to the Consulting Agreement in a bank account he set up in California; he visited Bluestar's offices in California twice; he continues to own Bluestar common stock; he is "employed by or closely affiliated with his co-defendant Ludwig, which maintains multiple offices in California"; and he has "continuing business interests in the United States" in relation to Base Genomics. ECF No. 88 at 24-25.

The Court credits Dr. Song's representation that he has no ongoing connection to California or the United States and that it would be burdensome for him to defend himself in California as a result. The Court is not persuaded by Bluestar's arguments that Dr. Song has ongoing connections to California and the United States for the following reasons. First, Bluestar has cited no authority that supports the proposition that Dr. Song's ownership of Bluestar common stock constitutes an ongoing connection with California or the United States based on which the Court can infer that defending a lawsuit in California would not be burdensome. Second, the Court is not persuaded that Dr. Song's alleged affiliation with Ludwig constitutes an ongoing connection with California or the United States. As discussed below in the context of Ludwig's motion to dismiss, the record indicates that Dr. Song holds himself out as an "assistant member" of Ludwig, but Bluestar has not alleged or pointed to any evidence showing what it means for Dr. Song to be an "assistant member" of Ludwig. Thus, the Court cannot reasonably infer that that Dr. Song's status as an "assistant member" of Ludwig would reduce the burden on Dr. Song of having to defend himself in California. Third, Bluestar does not allege or otherwise show that Dr. Song's involvement with Base Genomics, a company formed in the United Kingdom, involves an ongoing connection between Dr. Song and California or the United States.[11]

---

[11] Dr. Song declared that he traveled to New York in April 2019 and to New York and California in May 2019 in connection with Base Genomics. Song Decl. ¶¶ 31-32, ECF No. 34-1. Bluestar does not allege or otherwise show that Dr. Song has had any further contacts with California or the United States in connection with Base Genomics.

United States District Court
Northern District of California

United States District Court
Northern District of California

While the Court finds that Dr. Song would be burdened by having to defend himself in California in light of his lack of ongoing connections with California and the United States, the Court is not persuaded that the burden factor weighs *heavily* in his favor as it did for the Swedish doctors in *Core-Vent*. Dr. Song does not point to any information that demonstrates the extent of the burden on him, such as information about financial or other considerations. Without that information, the Court cannot reasonably infer that the burden on Dr. Song's would be onerous, as "[m]odern advances in communications and transportation have significantly reduced the burden of litigating in another country." *Core-Vent*, 11 F.3d at 1489 (citation and internal quotation marks omitted). Further, Dr. Song's contacts with California are distinguishable from those in *Core-Vent*. Whereas the Swedish doctors' contacts with California were limited to not more "than a few times on *random* occasions" *unrelated* to the claims against them, *id.* at 1483-84 (emphasis added), at least some of Dr. Song's past contacts with California were related to the Consulting Agreement.

Accordingly, the Court finds that the burden factor weighs against exercising personal jurisdiction over Dr. Song, but not heavily.

(3) <u>Extent of the conflict with the sovereignty of the defendant's state</u>. This factor "concerns the extent to which the exercise of jurisdiction would conflict with the sovereignty of the defendants' state." *Core-Vent*, 11 F.3d at 1489. "[L]itigation against an alien defendant creates a higher jurisdictional barrier than litigation against a citizen from a sister state because important sovereignty concerns exist." *Id.* (citation and internal quotation marks omitted). "In determining how much weight to give this factor, [courts] have focused on the presence or absence of connections to the United States in general, not just to the forum state." *Id.* (citation and internal quotation marks omitted). "Sovereignty concerns weigh more heavily when the defendants have no United States-based relationships." *Id.*

Dr. Song argues that this factor weighs heavily in his favor for the same reasons as the burden factor. ECF No. 83 at 21-22; ECF No. 91 at 17-18. Bluestar, on the other hand, contends that this factor does not weigh in Dr. Song's favor because Dr. Song "maintains a 'United States-based relationship' where he regularly interacts in California—namely, with co-defendant and

29

employer/affiliate Ludwig, which maintains a place of business in California"; and because Dr. Song has "continuing business interests" in the United States given that he has traveled to both New York and California for business relating to Base Genomics.  ECF No. 88 at 25.

For the reasons discussed above, the Court credits Dr. Song's representation that he has no ongoing connections to the United States.  Bluestar's assertions about Dr. Song's purported continuing relationships or interests in the United States are unsupported and therefore unpersuasive, for the reasons set forth above.  Given Dr. Song's lack of ongoing United States-based relationships, exercising personal jurisdiction over Dr. Song would raise sovereignty concerns.  Accordingly, the Court finds that this factor weighs against exercising personal jurisdiction over Dr. Song, but not heavily because he did have contacts with California and the United States in the past, including in connection with the Consulting Agreement.

(4) <u>The forum state's interest in adjudicating the dispute</u>.  California has an interest in protecting the rights of, and providing an effective means of redress for, its residents.  *See Core-Vent*, 11 F.3d at 1489.  Here, it is undisputed that Bluestar was a California resident at all relevant times and that it claims to have suffered injuries as a result of a breach of a contract that was partially negotiated and performed in the United States.  Accordingly, California has an interest in the present dispute, and this factor weighs in favor of exercising personal jurisdiction over Dr. Song.

(5) <u>Most efficient judicial resolution of the controversy</u>.  This factor concerns "the efficiency of the forum."  *Core-Vent*, 11 F.3d at 1489.  In evaluating this factor, courts "have looked primarily at where the witnesses and the evidence are likely to be located."  *Id.*

Dr. Song argues that this factor weighs in his favor because the witnesses and evidence regarding "the research and discoveries at issue in this case" are in Oxford, whereas any documents regarding the formation and performance of the Consulting Agreement are equally available to the parties.  ECF No. 91 at 17-18.  Bluestar, on the other hand, argues that "[m]uch of the evidence relating to this case is located in California, including: Bluestar employees; evidence relating to the formation of Bluestar; evidence relating to the formation and execution of the Bluestar contract; and evidence about the Stanford patent and its disclosed technology that was

developed at Stanford." ECF No. 88 at 20.

Dr. Song has not provided the Court with sufficient information to enable it to determine the relative importance of witnesses and evidence or the location of the most crucial witnesses and evidence. Based on the record before the Court, and as discussed in more detail below in the context of Dr. Song's motion to dismiss on the ground of *forum non conveniens*, witnesses and evidence that are relevant to Bluestar's claims against Dr. Song appear to be located in the United Kingdom, California, and New York. Because the evidence and witnesses are in multiple locations, this factor is neutral.

(6) <u>The importance of the forum to the plaintiff's interest in convenient and effective relief.</u> Bluestar represents that having to litigate its claims abroad would be burdensome because it is a small company with offices located only in California. The Court credits that representation and finds that this factor weighs in favor of exercising personal jurisdiction over Dr. Song, but not heavily given that Bluestar does not provide any detailed information that would permit the Court to determine the extent of its burden if it were forced to litigate abroad or of its convenience in litigating its claims in this forum.

(7) <u>The existence of an alternative forum.</u> This factor considers "whether an alternative forum exists." *Core-Vent*, 11 F.3d at 1490. The plaintiff has the "burden of proving the unavailability of an alternative forum." *Id.* To meet its burden, the plaintiff must show that "it would be precluded from suing [the defendant] outside of [the forum]." *See Fed. Deposit Ins. Corp. v. Brit.-Am. Ins. Co.*, 828 F.2d 1439, 1445 (9th Cir. 1987).

Dr. Song has shown that a court in the United Kingdom can serve as an alternative forum. Dr. Song has cited authorities, which Bluestar has not distinguished, holding that courts in the United Kingdom can adjudicate breach-of-contract claims and related tort claims. *See, e.g.*, *MacNeil Auto. Prod. Ltd v. Cannon Auto. Ltd*., No. 08 C 139, 2009 WL 65498, at *3 (N.D. Ill. Jan. 8, 2009) (holding that a contract claim "is cognizable in the general jurisdictional courts of the United Kingdom"); *Dibdin v. S. Tyneside NHS Healthcare Tr.*, No. CV 12-00206 DDP PLAX, 2013 WL 327324, at *3 (C.D. Cal. Jan. 29, 2013) (collecting cases holding that English courts can adjudicate tort claims, including tortious interference with business relations); *Tel. Sys. Int'l, Inc.*

*v. Network Telecom PLC*, 303 F. Supp. 2d 377, 381-82 (S.D.N.Y. 2003) ("[I]t is well-established that British courts are an adequate alternative forum for resolving disputes that may impact American corporations or citizens"). Dr. Song also represents that, as a permanent resident of the United Kingdom, he is amenable to service in the United Kingdom. Accordingly, Bluestar would be able to sue Dr. Song in the United Kingdom for breach of the Consulting Agreement and related torts.

Bluestar argues that "it is not clear that all the asserted claims can be brought in the United Kingdom," ECF No. 88 at 25, because, according to Bluestar, "Dr. Song does not even attempt to show" that Bluestar's claim against Dr. Song for breach of the implied covenant of good faith and fair dealing "is cognizable in an English court," *see id.* at 27. The Court is not persuaded. As noted, the burden of showing the unavailability of an alternative forum is on Bluestar. Bluestar cannot meet that burden by relying on Dr. Song's purported failure to show that a court in the United Kingdom can adjudicate a claim for breach of the implied covenant of good faith and fair dealing. *Hernandez v. City of Beaumont*, No. EDCV 13-00967 DDP, 2014 WL 6943881, at *7 (C.D. Cal. Dec. 8, 2014) ("Again, there is no proof of foreign law on whether a [French] forum is available."). Thus, the existence of an alternative forum weighs against exercising personal jurisdiction over Dr. Song.

Balancing of the factors: Here, neither party is clearly favored in the final balance; three factors weigh in favor of Dr. Song, three weigh in favor of Bluestar, and one is neutral. Because the factors are close, Dr. Song has not presented a "compelling case" that exercising jurisdiction over him would be unreasonable in violation of due process. *See Roth v. Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991) ("Appellees may be able to show that the exercise of jurisdiction might be unreasonable, but the closeness of the question manifests that they cannot do so in a compelling fashion.").

Accordingly, the Court DENIES Dr. Song's motion to dismiss the claims against him for lack of personal jurisdiction.

### 2. Ludwig

#### a. Purposeful direction

United States District Court
Northern District of California

As noted, the first prong of the specific jurisdiction test requires a showing of either purposeful availment for claims that sound in contract or purposeful direction for claims that sound in tort. *Schwarzenegger*, 374 F.3d at 802. Bluestar's claims against Ludwig are for intentional interference with contractual relations and conversion. Because those claims sound in tort, purposeful direction is the appropriate test. Both parties agree. *See* ECF No. 90 at 11 & n.3; ECF No. 82 at 19.

Courts evaluate purposeful direction under the three-part "effects" test derived from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). To find purposeful direction based on the *Calder* test, the defendant must have "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 805. "All three parts of the test must be satisfied" with respect to the same alleged act. *See id.* "[T]o establish the basis for specific personal jurisdiction [under *Calder*], a tort must involve the forum state itself, and not just have some effect on a party who resides there." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1145 (9th Cir. 2017). "Thus, a mere injury to a forum resident is not a sufficient connection to the forum." *Picot*, 780 F.3d at 1214 (citation and internal quotation marks omitted); *see also Walden*, 571 U.S. at 291 ("[T]he mere fact that [the defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction").

Here, Bluestar points to various alleged acts by Ludwig as satisfying the first and the second of the *Calder* requirements, *see* ECF No. 90 at 11-17, but Bluestar identifies only three of those acts as satisfying the third *Calder* requirement in addition to the first and second, *see id.* at 16-17. To the extent that Bluestar does not argue that an alleged act by Ludwig satisfies the third *Calder* requirement, the Court interprets that as an implicit concession by Bluestar that the alleged act does not satisfy all three *Calder* requirements.

Below, the Court analyzes in depth the three alleged acts by Ludwig that Bluestar contends satisfy all three requirements of the *Calder* test. *See* ECF No. 90 at 16-17. As discussed below, the first two alleged acts do not satisfy the second *Calder* requirement, which requires that the "defendant's allegedly tortious action was 'expressly aimed at the forum.'" *Picot*, 780 F.3d at

1214.  The third alleged act by Ludwig is an act by Dr. Song that Bluestar has not shown can be imputed to Ludwig, but even if the act could be imputed to Ludwig, the act would be irrelevant to the *Calder* analysis because it pertains to a claim that Bluestar has not asserted in the FAC. Accordingly, the Court cannot find purposeful direction under *Calder* based on any of the three alleged acts.  Although not required to do so, the Court also briefly discusses below why the other alleged acts by Ludwig that Bluestar implicitly concedes do not satisfy all three of the *Calder* requirements do not permit the Court to find purposeful direction under *Calder*.

The first alleged act is Ludwig's intentional interference with the Consulting Agreement, which Bluestar contends was an intentional act by Ludwig that caused Bluestar harm in California. ECF No. 90 at 17.  The acts of intentional interference that Bluestar alleges in the FAC are that Ludwig "employ[ed] Dr. Song to work in a subject matter area inconsistent and incompatible with Dr. Song's obligations and/or the scope of services rendered for Bluestar, and/or ha[d] Dr. Song assign his rights and interest in the Ludwig patent application to Ludwig," FAC ¶ 120.

Ludwig's alleged acts of intentional interference with the Consulting Agreement do not satisfy the second requirement of the *Calder* test, which requires that the "defendant's allegedly tortious action was 'expressly aimed at the forum.'" *Picot*, 780 F.3d at 1214.  "The exact form of [the express aiming] analysis varies from case to case and 'depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue.'" *Id.* (quoting *Schwarzenegger*, 374 F.3d at 807).  Where the type of tort alleged is intentional interference with a contract, courts look to "whether [the defendant] expressly aimed such interference at California."[12]  *Id.*

In *Picot*, the Ninth Circuit held that acts of interference with a sales contract by a Michigan defendant were not expressly aimed at the forum state of California and therefore could not be relied upon to find purposeful direction by that defendant.  *Id.* at 1215.  The Michigan defendant's

---

[12] Under California law, the elements for the tort of intentional interference with contractual relations are "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  *United Nat. Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014) (citation omitted).

alleged acts of interference involved making statements to an Ohio resident that caused a third-party corporation in Delaware to stop making payments pursuant to the sales contract, which were for the benefit of the California plaintiff. *Id.* The Ninth Circuit reasoned that, because the Michigan defendant committed the alleged acts of interference "from his residence in Michigan, without entering California, contacting any person in California, or otherwise reaching out to California," "none of [the Michigan defendant's] challenged conduct had anything to do with [California] itself." *Id.* (citation and internal quotation marks omitted). Accordingly, the Ninth Circuit held that the Michigan defendant's alleged acts of interference did not connect him with California "in a way sufficient to support the assertion of personal jurisdiction over him." *Id.* at 1215.

Here, as in *Picot*, Bluestar has pointed to no allegations or evidence indicating that Ludwig's alleged acts of interference with the Consulting Agreement—its alleged employment of Dr. Song under terms that would cause him to breach the Consulting Agreement and allegedly causing the assignment of the rights to the disputed technologies to itself—occurred in California or involved Ludwig making contacts with California. For example, Bluestar does not point to allegations or evidence showing that any negotiations or agreements that Ludwig might have had with Dr. Song about such alleged employment terms involved Ludwig making contacts with California. Bluestar also does not allege or otherwise show that Ludwig's alleged actions in connection with the assignment of the rights to the disputed technologies to itself, such as communications with Dr. Song about the assignments or actions taken to effectuate the assignments, took place in California or involved Ludwig making contacts with California. Bluestar alleges that "Ludwig's IP team, including Par Olsson, controlled the patent activities for the applications at issue." FAC ¶ 92. Ludwig's undisputed evidence shows that Ludwig's IP team and Par Olsson work in Ludwig's offices in New York. Olsson Decl. ¶ 1, ECF No. 31-1; *see also* Olsson Dep. Tr. at 67-69, ECF No. 90-3. This suggests that Ludwig's actions in connection with the assignments at issue took place outside of California.

The second act by Ludwig to which Bluestar points is Ludwig's alleged aiding and abetting of Dr. Song in diverting the patent rights to the disputed technologies to itself, which

Bluestar argues was an intentional act by Ludwig that "caused harm to Bluestar by depriving its rightful interests in the technologies that were developed based on the Quake/Song work."  ECF No. 90 at 16.  This alleged act by Ludwig, which is the predicate of Bluestar's conversion claim against Ludwig, also does not satisfy the express aiming requirement of the *Calder* test.  Where the type of tort alleged is conversion, courts examine whether the express aiming requirement is met by looking at whether the conduct interfering with the plaintiff's ownership or right to possession took place in the forum state.[13]  *See IPSL, LLC v. Coll. of Mount Saint Vincent*, 383 F. Supp. 3d 1128, 1139 (D. Or. 2019) (finding that "express aiming" requirement of *Calder* test was not met as to claim for conversion because the defendant did not engage in conduct interfering with the plaintiff's right of possession in the forum state).  Bluestar alleges that the conduct by Ludwig that interfered with Bluestar's ownership rights to the disputed technologies was its pursuit of patent applications and acceptance of Dr. Song's assignment of the rights to the disputed technologies.  *See* FAC ¶ 128.  As discussed above, Bluestar has pointed to no allegations or evidence that these actions took place in California or involved Ludwig making contacts with California.  Accordingly, these alleged acts by Ludwig also were not expressly aimed at California under *Calder.  See Picot*, 780 F.3d at 1215.

Bluestar cites *Bancroft & Masters, Inc. v. Augusta Nat. Inc*., 223 F.3d 1082, 1088 (9th Cir. 2000) for the proposition that Ludwig's acts of aiding and abetting Dr. Song in assigning the rights to the disputed technologies to itself satisfy the express aiming requirement of the *Calder* test on the basis that, when Ludwig committed such acts, it knew that they would cause harm to Bluestar in California, where it resides.  ECF No. 90 at 16.  *Bancroft* is no longer good law in light of the Supreme Court's holding in *Walden* that "mere injury to a forum resident is not a sufficient connection to the forum" and that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a

---

[13] "Conversion is the wrongful exercise of dominion over the property of another.  The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages[.]" *Nguyen v. Stephens Inst*., 529 F. Supp. 3d 1047, 1057–58 (N.D. Cal. 2021) (citation omitted).

United States District Court
Northern District of California

1    meaningful way." [14]  571 U.S. at 289-90.  Accordingly, *Bancroft* has no bearing on the purposeful

2    direction analysis here.

3         Bluestar also cites *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017), for the

4    proposition that Ludwig's acts of interference with the Consulting Agreement and aiding and

5    abetting of Dr. Song's conversion of the rights to the disputed technologies satisfy the *Calder* test

6    because they caused injury to Bluestar in California and (1) were "driven in part by Ludwig's

7    desire to obtain the disputed technology for its researchers in Ludwig's San Diego branch,"  ECF

8    No. 90 at 17; and (2) were motivated by a desire to "mutually benefit" (along with Dr. Song) from

9    the interference and conversion, as those actions allowed Ludwig to subsequently license the

10   disputed technologies to Dr. Song's company, Base Genomics, *id.* at 14.  In other words, Bluestar

11   argues that Ludwig's motivations for committing the alleged torts are relevant to the *Calder*

12   analysis.

13        *Morill* does not help Bluestar.  There, the Ninth Circuit rejected a similar argument to the

14

15   [14] In *Bancroft*, the defendant, a Georgia corporation, sent a letter to a third party in Virginia, which

16   stated that the plaintiff, a California resident, was committing trademark infringement by using a
     certain domain name.  223 F.3d at 1084-85.  The plaintiff filed suit in California for a judgment

17   declaring non-infringement as to the domain name.  *Id.*  At issue was whether the Georgia
     defendant's letter to a third party in Virginia could satisfy the "express aiming" requirement of the

18   *Calder* test as to the Georgia defendant.  The Ninth Circuit concluded that the "express aiming"
     requirement was satisfied based on the letter, even though it was sent by the defendant to Virginia

19   and not California, because the plaintiff alleged that the defendant had sent the letter intentionally
     with the goal of "individually targeting" the plaintiff, and with the knowledge that the plaintiff did

20   business almost exclusively in California and would suffer injury in California.  *Id.* at 1807.  The
     Ninth Circuit held that the express aiming "requirement is satisfied when the defendant is alleged

21   to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a
     resident of the forum state."  *Id.*

22   The "individualized targeting" reasoning that was the basis for the holding in *Bancroft* was

23   rejected and overruled by the Supreme Court in *Walden*, 571 U.S. at 279.  There, the Supreme
     Court reversed *Fiore v. Walden*, a Ninth Circuit opinion that had expressly relied on *Bancroft* to

24   hold that, "where there was 'individual targeting' of forum residents—actions taken outside the
     forum state for the purpose of affecting a particular forum resident or a person with strong forum

25   connections," the "express aiming requirement [is] satisfied."  *See* 688 F.3d 558, 577 (9th Cir.
     2012) (citing *Bancroft*, 223 F.3d at 1087).  The Supreme Court concluded in *Walden* that the

26   Ninth Circuit's interpretation of the *Calder* requirements was erroneous, because it "improperly
     attribute[d] a plaintiff's forum connections to the defendant and ma[de] those connections

27   'decisive' in the jurisdictional analysis."  571 U.S. at 289.  It held, "The proper question is not
     where the plaintiff experienced a particular injury or effect but whether the defendant's conduct

28   connects him to the forum in a meaningful way."  *Id.* at 290.

United States District Court
Northern District of California

one that Bluestar makes here.  It held that a defendant's "subjective motivations are not material to the [*Calder*] analysis" and that what matters for the purpose of determining whether the *Calder* test is met is whether the tortious conduct that gives rise to the plaintiff's claim was "directed at [the forum], not just at individuals who resided there."[15]  *Id.* at 1148-49.  Here, under *Morrill*, Ludwig's alleged subjective motivations for allegedly interfering with the Consulting Agreement and aiding and abetting Dr. Song's conversion of the rights to the disputed technologies are not material to the *Calder* analysis.  What matters is whether the alleged tortious acts that give rise to Bluestar's claims against Ludwig were directed at and involved California, instead of merely having an effect on a resident of California.  As discussed above, Bluestar has not shown that that is the case.

The third act to which Bluestar points is one that allegedly was committed by Dr. Song, not Ludwig.  Bluestar argues that Dr. Song "offered the TAPS technology for Dr. Bing Ren's use at Ludwig San Diego in 2018," which "caused harm to Bluestar because it compromised Bluestar's exclusive rights that Bluestar should have obtained pursuant to Dr. Song [sic] consulting agreement."  ECF No. 90 at 16-17 (emphasis added).  In the FAC, Bluestar alleges that

---

[15] In *Morrill*, the plaintiffs, residents of Arizona, brought claims in Arizona for abuse of process and wrongful institution of civil proceedings against five defendants, who were residents of North Dakota and Nevada.  873 F.3d at 1140-41.  The defendants had allegedly instituted various civil proceedings against the plaintiffs in Nevada, which the plaintiffs alleged were frivolous and wrongful.  The plaintiffs argued that an Arizona court could exercise personal jurisdiction over the defendants because the defendants had allegedly intended for the Nevada litigation to cause the plaintiffs reputational injury in Arizona, and because the defendants' alleged torts against the plaintiffs "were not complete" until the plaintiffs suffered the reputational harm in Arizona based on the defendants' conduct.  *Id.* at 1144 (internal quotation marks omitted).  The Ninth Circuit rejected that argument and held that "Defendants' subjective motivations are not material to the [*Calder*] analysis" and that what matters under the *Calder* test is whether the "alleged actions were directed at Arizona, not just at individuals who resided there."  *Id.* at 1148-49.  The Ninth Circuit concluded that the defendants' actions were not directed to Arizona.  It reasoned that the defendants' contacts with Arizona—which included serving pleadings on the plaintiffs in Arizona, sending letters and making phone calls to plaintiffs in Arizona, and following Arizona civil procedure rules for serving a deposition subpoena on the plaintiffs in Arizona in connection with the Nevada litigation—occurred in Arizona "only because it happened to be where Plaintiffs resided."  *Id.* at 1144.  It held that, "a tort must involve the forum state itself, and not just have some effect on a party who resides there," but that requirement was not met because the plaintiffs' claims against the defendants arose of the allegedly wrongfully-instituted litigation in Nevada and "[t]he alleged tortious conduct [in Arizona] was a component part of the litigation in Nevada" and merely "ancillary to the litigation in Nevada."  *Id.* at 1149.

"Dr. Song was acting in his capacity as a Ludwig representative when he offered to provide protocols to Dr. Ren's Ludwig laboratory in California to use the TAPS technology."  FAC ¶ 93. Bluestar contends that this alleged intentional act by Dr. Song can be imputed to Ludwig under an agency theory for specific jurisdiction purposes because Dr. Song performed it "with Ludwig's knowledge and direction."  *See* ECF No. 90 at 14-15 (arguing that for purposes of personal jurisdiction, "the actions of an agent are attributable to the principal").

The only case that Bluestar cites for the proposition that Dr. Song's contacts with California can be imputed to Ludwig under an agency theory, *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990), is distinguishable.  *See* ECF No. 90 at 15.  There, the defendants were a law firm and attorneys who were partners of the law firm.  The Ninth Circuit held that the partners' contacts with California could be imputed to the law firm (a partnership) for specific jurisdiction purposes because, under California and Florida statutes governing partnerships, "a partner is an agent of the partnership when carrying on the business of the partnership in the usual way," and it was undisputed that the partners were members of the partnership and that their contacts with California were "within the scope of the ordinary business of the partnership."  *Id.* at 1362 (citations omitted).  Here, Bluestar points to no allegations or evidence indicating the existence of a partnership involving Dr. Song and Ludwig.  This renders *Sher* unhelpful.

Bluestar's reliance on *Sher* is misplaced for the additional reason that the standards for imputing an agent's contacts to a principal for personal jurisdiction purposes have changed since that opinion was issued.  In *Daimler AG v. Bauman*, 571 U.S. 117, 135 (2014), the Supreme Court held that an agent's contacts cannot be imputed to a principal to find general jurisdiction over the principal, but it noted that agency relationships "may be relevant to the existence of specific jurisdiction." 571 U.S. 117, 135 & n.13 (2014).  In *Williams v. Yamaha Motor Co.*, the Ninth Circuit recognized that *Daimler* "left open the question of whether an agency relationship might justify the exercise of specific jurisdiction," and it examined what a plaintiff would need to allege to permit an agent's forum contacts to be imputed to the principal for specific jurisdiction purposes, assuming that *Daimler* did not foreclose doing so.  *See* 851 F.3d 1015, 1024 (9th Cir. 2017).  The alleged principal in *Williams* was a parent corporation, and the alleged agent was the

United States District Court
Northern District of California

1   parent's subsidiary.  The Ninth Circuit held that, because "[f]undamental tenets of agency theory

2   require that an agent act on the principal's behalf and subject to the principal's control," to impute

3   the subsidiary's forum contacts to the parent, the parent "must have the right to substantially

4   control its subsidiary's activities."  *Id.* at 1025 (citations and internal quotation marks omitted).

5   The Ninth Circuit held that the plaintiffs had not made a prima facie showing of an agency

6   relationship pursuant to this standard, because the plaintiffs "neither allege[d] nor otherwise

7   show[ed] that [the parent] had the right to control" the subsidiary's activities.  *Id.*  The Ninth

8   Circuit declined to "credit" "conclusory legal statement[s] unsupported by any factual assertion

9   regarding [the parent's] control over [the subsidiary]."  *Id.* at 1025 n.5.

10      Courts in this district routinely rely on *Williams* to hold that "specific jurisdiction may be

11   based on an agent's contacts with the forum state only where the 'agent act[s] on the principal's

12   behalf *and* subject to the principal's control.'"  *See, e.g.*, *Juniper Networks, Inc. v. Andrade*, No.

13   20-CV-02360-BLF, 2020 WL 5630023, at *6 (N.D. Cal. Sept. 21, 2020) (quoting *Williams,* 851

14   F.3d at 1024) (emphasis in the original); *iAirWair Int'l Ltd. v. Pull & Bear Espana SA*, No. 19-

15   CV-07641-SI, 2020 WL 2113833, at *4 (N.D. Cal. May 4, 2020).

16      Because *Sher* does not address the control issue, it is not clear that *Sher* remains good law

17   in light of *Williams*.  *See Juniper Networks*, 2020 WL 5630023, at *6 (declining to rely "on cases

18   that pre-date *Daimler* and *Williams*" that "do not address the control issue" when considering

19   whether an agent's contacts can be imputed to the principal because "*Daimler* and *Williams*

20   altered the standard for exercising personal jurisdiction based on contacts of agents").

21      In the FAC, Bluestar does not allege any non-conclusory facts that raise the inference that

22   Ludwig had the right to substantially control Dr. Song in the context of his contacts with

23   California, as required under *Williams*.  Bluestar alleges, conclusorily, that Ludwig is "Dr. Song's

24   employer," FAC ¶ 119, that "Dr. Song holds or held himself out as an Assistant Member of

25   Ludwig," *id.* ¶ 23, and that, as an assistant member of Ludwig, "Dr. Song represented Ludwig"

26   and Dr. Song "was acting for Ludwig" when he allegedly collaborated with staff at Ludwig's San

27   Diego branch and discussed the disputed technologies with Bluestar employees in California, *id.*

28   ¶¶ 90-94.  Bluestar does not allege any facts as to the terms of Dr. Song's alleged employment

United States District Court
Northern District of California

1   with Ludwig, or as to what it means for Dr. Song to be an "assistant member" of Ludwig and for

2   Dr. Song to "represent" Ludwig as such.  Bluestar's conclusory allegations, without more, do not

3   raise the inference that Ludwig had the right to control Dr. Song's contacts with California,

4   particularly given that Bluestar alleges other facts that suggest the reverse, namely that Dr. Song

5   controlled Ludwig.  *See, e.g.*, *id.* ¶ 72 ("*Dr. Song redirected Ludwig* to instead license those

6   techniques to his own startup, Base Genomics, in which he has significant founding equity.")

7   (emphasis added); *id.* ¶ 73 ("In December 2018, the option and license agreement between

8   Ludwig and Bluestar that was agreed to in principle *was declined by Ludwig* in favor of the

9   licensing discussion between Base Genomics and Ludwig *at Dr. Song's direction*.") (emphasis

10  added); *see also Est. of Daher v. LSH Co.*, 575 F. Supp. 3d 1231, 1238-39 (C.D. Cal. 2021)

11  (holding that acts of alleged agent could not be imputed to alleged principal for specific

12  jurisdiction purposes because the plaintiff's "allegations support a conclusion that the agent

13  controlled the principal, rather than the principal controlling the agent – the exact opposite of the

14  Ninth Circuit's reasoning in *Williams*").  The only allegation regarding "control" in the FAC is

15  that Ludwig's IP team, including Par Olsson, "controlled *the patenting process* for the patent

16  rights at issue" because they decided "whether the patent applications should be filed."  *See* FAC ¶

17  92 (emphasis added).  That allegation does not support an inference that Ludwig had the right to

18  control Dr. Song in the context of his contacts with California.

19       Bluestar argues that "evidence in this case unequivocally supports the interwoven

20  relationship between Dr. Song and Ludwig."  ECF No. 90 at 15.  Bluestar points to deposition

21  testimony that Dr. Song is an "assistant member of the Ludwig Institute for Cancer Research" and

22  an "Oxford research scientist" in the "Ludwig department or unit."[16]  Bluestar also points to

23  Dr. Song's declarations, which Bluestar contends show that Dr. Song does not deny that he is an

24

25  _____

    [16] *See* Olsson Dep. Tr. at 31-32, 37-38 ECF No. 90-3 (Ludwig's Par Olsson testifying that

26  Dr. Song is an "assistant member" of Ludwig's "Oxford branch," which is "one of the institute's
    branches" and that "he's an assistant member of the Ludwig Institute for Cancer Research"); Song

27  Dep. Tr. at 21-22, 62-63, ECF No. 90-2 (Dr. Song testifying that he gave a presentation to
    Bluestar in California in May 2018 on the disputed TAPS technique as an "Oxford scientist,

28  Oxford academics, as well as a Ludwig assistant member" and "Oxford research scientist" in the
    "Ludwig department or unit").

"assistant member" of Ludwig and indicate that one of his presentations included the mark "Ludwig Cancer Research" in the footer.  Song Decl. ¶ 14, ECF No. 31-2 & Song Decl., ECF No. 34-1.  Bluestar also points to Dr. Song's employment contract with the University of Oxford, which states that Dr. Song's employment with the University of Oxford is "full-time" and that Dr. Song's "Department" at the University is the "Ludwig Institute for Cancer Research, Target Discovery Institute."  Olsson Decl., Ex. 3 at 1, ECF No. 31-1 at 20.  Bluestar does not point to any term in this employment contract, or in any other contract, that states that Ludwig is or was Dr. Song's employer or that indicates that Dr. Song was under Ludwig's control.  Bluestar also points to a document titled "Conflict of Interest declaration and management plan," in which Dr. Song stated that he is a "full time employee of the University [of Oxford]" and discussed his plan for managing a potential conflict of interest arising out of his role as co-founder and advisor of Base Genomics.  ECF No. 89-4 at 1.  Bluestar argues, without citing to any evidence or authority, that this document "shows that Dr. Song reports his 'Conflict of Interest declaration and management plan' to the department of 'Ludwig Institute for Cancer Research.'"  ECF No. 90 at 15.

After carefully reviewing the evidence and documents to which Bluestar points, the Court finds that they indicate some kind of affiliation between Dr. Song and Ludwig as a result of Dr. Song being an "assistant member" of Ludwig's branch at the University of Oxford.  As noted, however, *Williams* requires a prima facie showing that the agent acted on the principal's behalf *and* under the principal's control.  The Court finds no indication in the evidence and documents to which Bluestar points that Ludwig had the right to substantially control Dr. Song's contacts with California.  Bluestar's failure to allege or otherwise show that Ludwig controlled Dr. Song is notable given that the Court authorized jurisdictional discovery in the form of depositions and requests for documents and interrogatories on topics that bear on that issue.[17]  Because Bluestar

---

[17] The topics included "the terms of" Dr. Song's relationship with Ludwig, whether formal or informal; any agreements between Dr. Song and Ludwig; the "scope of work that Dr. Song was intended to perform on behalf of, funded by, or otherwise supported by Ludwig"; Dr. Song's "status" as assistant member of Ludwig; and the terms of Ludwig's relationship with the University of Oxford as it relates to Dr. Song.  *See* ECF No. 63 at 1-4.

has not alleged or otherwise shown that Ludwig had the right to substantially control Dr. Song in the context of his contacts with California, Dr. Song's contacts with California cannot be imputed to Ludwig under an agency theory for specific jurisdiction purposes. *See Williams*, 851 F.3d at 1025 & n.5; *see also iAirWair*, 2020 WL 2113833, at *4 (holding that allegations indicating "some degree of cooperation or coordination" between the alleged principal and agent were insufficient to make a prima facie case for an agency relationship under *Williams* because they did not "establish" that the alleged principal had "the right to substantially control" the activities of the alleged agent).

Even assuming, however, that Dr. Song's contacts with California could be imputed to Ludwig for specific jurisdiction purposes, as Bluestar contends, Dr. Song's "offer[ing of] the TAPS technology for Dr. Bing Ren's *use* at Ludwig San Diego in 2018," ECF No. 90 at 16 (emphasis added), would not help establish purposeful direction as to Ludwig. This is because Bluestar has not brought any claim against Ludwig that arises out of the improper *use* or *disclosure* of the disputed technologies by anyone or to anyone. "A plaintiff may not create personal jurisdiction over one claim by arguing that jurisdiction might be proper over a different, hypothetical claim not before the court." *See Picot*, 780 F.3d at 1215 n.3. The personal jurisdictional analysis under *Calder* is governed by the claims that are asserted against the defendant in the complaint. *Id.* Tortious conduct that could give rise to a claim not asserted in the complaint is irrelevant to the *Calder* analysis. *See id.* (declining to consider purported acts of extortion by the Michigan defendant that were allegedly aimed at the California forum in determining whether the *Calder* requirements were met because "[the California plaintiff] did not assert an extortion claim in his complaint" and, therefore, the alleged extortion "has no bearing on the jurisdictional issues"). Bluestar argues in its opposition that Dr. Song's offering of the disputed TAPS technique to staff at Ludwig's San Diego branch caused it harm because it "compromised Bluestar's exclusive rights that Bluestar should have obtained pursuant to Dr. Song [sic] consulting agreement." ECF No. 90 at 16-17 (emphasis added). Bluestar has not asserted any claim against Ludwig that is based on that alleged harm or theory of liability. Bluestar does not allege that the use of the disputed technologies by staff at Ludwig's San Diego branch

impacted the rights and interest to the disputed technologies.  Accordingly, even if Dr. Song's

offering of the disputed technologies for use by staff at Ludwig's San Diego branch constituted

tortious conduct that could be imputed to Ludwig under an agency theory, that conduct would

have no bearing on the *Calder* analysis as to Ludwig because it pertains to a "hypothetical claim

not before the court."  *Picot*, 780 F.3d at 1215 n.3.

As noted, with respect to the remaining alleged acts by Ludwig, Bluestar implicitly

concedes that they do not satisfy all three *Calder* requirements.  Although the Court is not required

to analyze them based on Bluestar's implicit concession, the Court has done so for the sake of

completeness, and it finds that none of them permits a finding of purposeful direction as to

Ludwig under *Calder*.[18]

---

[18] Below, the Court discusses briefly why none of those alleged acts by Ludwig permits a finding of purposeful direction under *Calder*.

(1) Bluestar alleges that Dr. Song attended a conference sponsored by Ludwig in California in 2016 and thereafter collaborated with researchers at Ludwig's San Diego branch on the disputed technologies, and it argues that this constitutes an intentional act by Ludwig directed at California. ECF No. 90 at 11-12.  For the reasons discussed above, Bluestar has not shown that Dr. Song's contacts with California can be imputed to Ludwig, but even if it had, Dr. Song's alleged collaboration with researchers at Ludwig's San Diego branch would be irrelevant to the *Calder* analysis as to Ludwig because Bluestar has not asserted any claim against Ludwig that arises out of any alleged collaboration between Dr. Song and researchers at Ludwig's San Diego branch, with respect to the development of the disputed technologies or otherwise.  *See Picot*, 780 F.3d at 1215 n.3.  For that reason, the alleged collaborations or discussions do not satisfy the third *Calder* requirement ("causing harm").

(2) Bluestar alleges that in 2018 Dr. Song discussed the TAPS technique with Bluestar and solicited a sponsored research agreement from Bluestar based on which Bluestar would pay for a research project in Dr. Song's laboratory at the University of Oxford.  ECF No. 90 at 12-13. Bluestar argues that this constitutes an intentional act by Ludwig directed at California.  *Id.*  For the reasons discussed above, Bluestar has not shown that Dr. Song's contacts with California can be imputed to Ludwig, but even if it had, Dr. Song's alleged discussions with or solicitations of Bluestar would be irrelevant to the *Calder* analysis because Bluestar has not asserted any claim against Ludwig that arises out of any such alleged discussions or solicitations.  *See Picot*, 780 F.3d at 1215 n.3.  For that reason, the alleged discussions or solicitations do not satisfy the third *Calder* requirement ("causing harm").

(3) Bluestar argues that, after Ludwig accepted the assignment of the rights to the disputed technologies, Ludwig "directed the licensing" of the patent rights to the disputed technologies to Base Genomics so that Ludwig and Dr. Song could share the benefits of the disputed technologies without Bluestar.  ECF No. 90 at 14.  Bluestar argues that this is an intentional act by Ludwig that "diverted the patent rights" to the disputed technologies away from Bluestar and to Base Genomics.  *Id.*  This alleged act does not satisfy the "express aiming" requirement of the *Calder* test (the second requirement) because Bluestar has not alleged or otherwise shown that Ludwig's

44

In sum, Bluestar has failed to make a prima facie showing under *Calder* for finding purposeful direction with respect to Ludwig.  As a result, Bluestar has not satisfied the first prong of the specific jurisdiction test as to Ludwig.

### b. Arises or relates to the defendant's contacts with the forum and reasonableness

Because Bluestar has failed to meet its burden as to the first prong of the specific jurisdiction analysis, the Court cannot exercise personal jurisdiction over Ludwig and need not proceed to the second and third prongs, which examine, respectively, whether the claims against the defendant arise out of or relate to the defendant's contacts with the forum, and whether the exercise of personal jurisdiction over the defendant would be unreasonable.  *Boschetto*, 539 F.3d at 1016 ("[I]f the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed.").

The Court, therefore, GRANTS Ludwig's motion to dismiss Bluestar's claims against it for lack of personal jurisdiction.  The Court DENIES AS MOOT the motions to dismiss that Ludwig brings in the alternative under Rule 12(b)(6) and for improper venue and *forum non conveniens*.

## IV. *FORUM NON CONVENIENS*

Because the Court has personal jurisdiction over Dr. Song, the Court now considers Dr. Song's motion to dismiss on the ground of *forum non conveniens*.

### A. Legal Standard

"A district court has discretion to decline to exercise jurisdiction in a case where litigation in a foreign forum would be more convenient for the parties."  *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001) (citation omitted).  "In dismissing an action on *forum non conveniens* grounds the court must examine: (1) whether an adequate alternative forum exists, and (2) whether the balance of private and public interest factors favors dismissal."  *Id.* (citation

---

licensing of the patent rights to the disputed technologies to Base Genomics, a company formed in the United Kingdom, was a tortious act that took place in California or otherwise involved Ludwig making contacts with California.

omitted).  Where, as here, the plaintiff is a resident of the forum, the "plaintiff's choice of forum will not be disturbed unless the 'private interest' and the 'public interest' factors *strongly* favor trial in a foreign country."  *Id.* at 1145 (emphasis added).  This is because, "[w]hen a domestic plaintiff initiates litigation in its home forum, it is presumptively convenient."  *Carijano*, 643 F.3d at 1227.  "[A] plaintiff need not select the optimal forum for his claim, but only a forum that is not so oppressive and vexatious to the defendant as to be out of proportion to plaintiff's convenience."  *Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1180 (9th Cir. 2006) (citation and internal quotation marks omitted).

> **B.**      **Discussion**

> **1.**      **Adequate alternative forum**

"The defendant bears the burden of proving the existence of an adequate alternative forum." *Lueck*, 236 F.3d at 1143 (citation and internal quotation marks omitted).  "An alternative forum is deemed adequate if: (1) the defendant is amenable to process there; and (2) the other jurisdiction offers a satisfactory remedy."  *Carijano*, 643 F.3d at 1225.  "[I]t is only in 'rare circumstances . . . where the remedy provided by the alternative forum . . . is so clearly inadequate or unsatisfactory, that it is no remedy at all,' that this requirement is not met."  *Lueck*, 236 F.3d at 1143 (citation omitted).

As discussed above in section III.B.1.c. of this order, Dr. Song has shown that Bluestar could sue him in the United Kingdom for breach of the Consulting Agreement and related tort claims and that he is amenable to service in the United Kingdom.  Because Dr. Song has shown that the United Kingdom can provide Bluestar with "some remedy for his wrong," he has met his burden to show that the United Kingdom would be an adequate alternative forum.  *Lueck*, 236 F.3d at 1143.

Bluestar argues that Dr. Song has not shown that Bluestar's claim for breach of the implied covenant of good faith and fair dealing is "cognizable in the United Kingdom."  ECF No. 88 at 27. Bluestar, however, cites no authority for the proposition that the foreign forum must be capable of adjudicating each claim that the plaintiff could have brought in a United States court.  That a foreign forum's law or available remedies are "less favorable" than those of the plaintiff's chosen

United States District Court
Northern District of California

forum does not mean that the foreign forum is inadequate.  *See Loya v. Starwood Hotels & Resorts Worldwide, Inc.*, 583 F.3d 656, 666 (9th Cir. 2009) (holding that a foreign forum is not inadequate merely because "the law, or the remedy afforded, is less favorable in the foreign forum," as a "foreign forum must only provide the plaintiff with 'some' remedy in order for the alternative forum to be adequate").  A "foreign forum will be deemed adequate unless it offers no practical remedy for the plaintiff's complained of wrong."  *Lueck*, 236 F.3d at 1144.  Bluestar has not shown that the United Kingdom offers "no practical remedy" for the wrongs it allegedly suffered as a result of Dr. Song's conduct.  Accordingly, a court in the United Kingdom would be an adequate alternative forum.

### 2.      Private factors

The private interest factors that a court must consider and weigh are: "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Lueck*, 236 F.3d at 1145 (internal quotation marks and citations omitted).

### a.      Residence of the parties and witnesses

The residence of the parties is neutral as between California and the United Kingdom. Bluestar resides in California, and Dr. Song resides in the United Kingdom.

As to the residence of the witnesses, a party moving for dismissal on *forum non conveniens* grounds must provide, "not simply the numbers of witnesses in each locale, but information sufficient to assist the court in assessing the materiality and importance of each witness."  *Bos. Telecommunications Grp., Inc. v. Wood*, 588 F.3d 1201, 1210 (9th Cir. 2009) (citation and internal quotation marks omitted).  This is because "a court should evaluate the materiality and importance of the anticipated [evidence and] witnesses' testimony and then determine[] their accessibility and convenience to the forum."  *Lueck*, 236 F.3d at 1146 (citation and internal quotation marks omitted, alterations in the original).

Here, Dr. Song argues that "[a]ll the witnesses and documentary evidence related to [Dr.

Song's] research and Dr. Song's inventions are in Oxford," "including Dr. Song's co-inventor and employees of Oxford, who will be necessary to testify about the research and inventions at issue as well as Dr. Song's employment and relationship with Oxford."  ECF No. 83 at 24-25.  Dr. Song does not identify or quantify the witnesses located in the United Kingdom, nor does he describe the matters about which each of those witnesses would testify or explain why that information is material to his defense.

On the other hand, Bluestar argues that "most relevant witnesses are in California," but it does not identity or quantify those witnesses or explain why those witnesses are material to its claims, either.  ECF No. 88 at 27.

Bluestar's claims against Dr. Song turn on (1) whether the disputed technologies are covered work product under the Consulting Agreement, and (2) whether Dr. Song breached the Consulting Agreement by allegedly assigning the rights to the disputed technologies to Ludwig and by allegedly accepting employment terms from Ludwig that were contrary to his obligations under the Consulting Agreement.  Thus, witnesses that can speak to those issues are critical to the resolution of the claims.  Based on the record before the Court, it appears that witnesses relevant to those issues are located in the United Kingdom, California, and New York.[19]  Dr. Song does not provide sufficient information to enable the Court to evaluate the materiality of the witnesses who reside in the United Kingdom relative to those that reside in other locations.  Accordingly, the Court cannot determine that one forum would be clearly more convenient than another.

Where, as here, relevant witnesses are located in multiple locations and the party moving

---

[19] Witnesses relevant to the issue of whether the disputed technologies are covered by the Consulting Agreement appear to reside in the United Kingdom (e.g., Dr. Song and his co-inventors and perhaps other University of Oxford employees who Dr. Song has not identified by name or quantified), as well as California (e.g., Bluestar employees who negotiated and executed the Consulting Agreement on behalf of Bluestar and may have monitored Dr. Song's performance of the same, who Bluestar has not identified by name or quantified).  Witnesses relevant to Dr. Song's alleged assignment of the disputed technologies to Ludwig appear to be located in the United Kingdom (e.g., Dr. Song and his co-inventors and co-assignors, who Dr. Song represents reside in the United Kingdom) and New York (e.g., Ludwig's IP team located in New York, which Bluestar alleges controlled the patenting process and assignments as to the disputed technologies).  Bluestar has not alleged or otherwise shown the location of Dr. Song's alleged acceptance or negotiation of employment terms from Ludwig, so it is unclear where witnesses relevant to that issue are located.

for dismissal has not provided sufficient information about the location and materiality of the witnesses, this factor weighs against dismissal. *See Bos. Telecommunications*, 588 F.3d at 1210 (holding that, where witnesses were in multiple locations, "the district court abused its discretion in holding that this private interest factor was neutral when [the defendant] provided very little information that would have enabled the district court to understand why various witnesses were material to his defense" and made conclusory statements about witnesses "without explaining who these witnesses were or what information each would have").

Accordingly, this factor weighs against dismissal.

### b.      Forum's convenience to the litigants

Dr. Song and Bluestar each contend that litigating in the forum they each prefer would be more convenient, and that litigating in the forum preferred by the other party would be burdensome. Because neither party has offered specific information as to the extent of its prospective burden or convenience, the Court is unable to determine whether this forum or a court in the United Kingdom would be more convenient overall. Accordingly, this factor is neutral.

### c.      Access to physical evidence and other sources of proof

Dr. Song contends that documentary evidence pertaining to Dr. Song's research and development of the disputed technologies is "in Oxford." ECF No. 83 at 24. Dr. Song implies that this documentary evidence is under the control of a non-party in the U.K., given that he cites *Dibdin v. S. Tyneside NHS Healthcare Tr.*, No. CV 12-00206 DDP PLAX, 2013 WL 327324, at *5 (C.D. Cal. Jan. 29, 2013) ("*Dibdin*") for the proposition that this factor weighs "heavily in favor of dismissal where [a] U.S. court [does] not have authority to order production of documents from [a] non-party in UK." *See id.* Dr. Song also contends that documentary evidence regarding the formation and performance of the Consulting Agreement is equally available to the parties and the burden of transporting that evidence is neutral. *Id.* at 24-25.

Bluestar does not dispute Dr. Song's assertions with respect to the accessibility of relevant physical evidence, and it does not distinguish *Dibdin*. Bluestar's only response is that the presence of "some evidence" in the United Kingdom "is not dispositive" of Dr. Song's motion because of "the evidence that is already located in California[.]" ECF No. 88 at 27-28. Bluestar

1    does not describe the evidence located in California.

2         Based on the record before the Court, physical evidence relevant to the resolution of

3    Bluestar's claims appears to be located in California and the United Kingdom.  However, based on

4    Dr. Song's representations, which Bluestar does not dispute, the evidence in California is in the

5    parties' possession or control, whereas at least some of the evidence in the United Kingdom may

6    be in the possession or control of a non-party in the United Kingdom and this Court cannot compel

7    that non-party to produce it.  Accordingly, it appears that the parties would have access to more

8    relevant physical evidence if the case were litigated in the United Kingdom than if it were litigated

9    in this forum.  This weighs in favor of dismissal, albeit not strongly because Dr. Song has not

10   provided sufficient information to enable the Court to determine the relative importance of any

11   documentary evidence that may be in the possession or control of a non-party in the United

12   Kingdom.

13                    **d.        Whether unwilling witnesses can be compelled to testify**

14        For this factor, the "question is not whether the witnesses are beyond the reach of

15   compulsory process, but whether it has been alleged or shown that witnesses would be unwilling

16   to testify." *See Carijano*, 643 F.3d at 1231 (citations omitted).  The question of whether witnesses

17   are beyond the reach of the compulsory process becomes relevant only if and when it has been

18   alleged or shown that those witnesses would be unwilling to testify.  *See id.*

19        Neither Dr. Song nor Bluestar alleges that any non-party witnesses would be unwilling to

20   testify in California or the United Kingdom, which suggests that neither California nor the United

21   Kingdom would be a more convenient forum.  Dr. Song represents that non-party witnesses in the

22   United Kingdom, including his co-inventor and "other employees of Oxford," cannot be

23   compelled to testify in the United States.  ECF No. 83 at 24-25.  That this Court would not be able

24   to compel non-party witnesses who reside in the United Kingdom to testify in California does not

25   weigh in favor of dismissal because Dr. Song does not allege that any non-party witnesses in the

26   United Kingdom would be unwilling to testify in California if this case were litigated there.[20]

27   ───────────────

28   [20] Dr. Song cites *Tel. Sys. Int'l, Inc. v. Network Telecom PLC*, 303 F. Supp. 2d 377, 383 (S.D.N.Y.
     2003) for the proposition that this factor weighs in favor of dismissal where non-party witnesses

United States District Court
Northern District of California

1    Accordingly, this factor is neutral.

2                    **e.        The cost of bringing witnesses to trial**

3         Neither party addresses this factor.  Accordingly, this factor is neutral.

4                    **f.        The enforceability of the judgment**

5         Neither party addresses this issue.  Accordingly, this factor is neutral.

6                    **g.        All other practical problems that make trial easy, expeditious,
                               and inexpensive**

7

8         Neither side has identified other practical problems.  This factor, therefore, is neutral.

9                    **h.        Conclusion as to private factors**

10        One of the private factors weighs in favor of dismissal, one of them weighs against

11   dismissal, and five are neutral.  Accordingly, on balance, the private factors are neutral.

12              **3.        Public factors**

13         The public factors that a court must consider and weigh are: "(1) the local interest in the

14   lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and

15   juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular

16   forum."  *Lueck*, 236 F.3d at 1147 (citation and internal quotation marks omitted).

17                    **a.        Local interest in the lawsuit**

18         "[W]ith this [public] interest factor, [courts] ask only if there is an identifiable local interest

19   in the controversy, not whether another forum also has an interest."  *Bos. Telecommunications*,

20   588 F.3d at 1212 (citation and internal quotation marks omitted).  Bluestar contends that

21   California has an interest in this lawsuit because it involves a California resident seeking redress

22

23   ─────────────────────────

24   are located abroad and cannot be compelled to testify by a court in the United States.  ECF No. 83
     at 24-25.  That case does not alter the analysis because it applies Second Circuit standards for
     evaluating *forum non conveniens* motions.  In the Ninth Circuit, courts look first to whether
25   witnesses would be unwilling to testify; the question of whether witnesses can be compelled to
     testify is relevant only if it is alleged or shown that the witnesses would be unwilling to do so.  *See*
26   *Carijano*, 643 F.3d at 1231 (holding that the proper inquiry under this factor looks to "whether it
     has been alleged or shown that witnesses would be unwilling to testify" because that framing of
     the inquiry is "consistent with *Gulf Oil*, the Supreme Court case that first established the *forum*
27   *non conveniens* factors, which spoke of the 'availability of compulsory process for attendance of
     *unwilling*, and the cost of obtaining attendance of willing, witnesses'") (citation omitted, emphasis
28   added).

United States District Court
Northern District of California

1    for injuries caused by a breach of a "California contract."  ECF No. 88 at 28.  Dr. Song does not

2    argue that California lacks an interest in this lawsuit; he argues only that "the interest of England

3    is greater" because he resides in the United Kingdom, is employed by the University of Oxford,

4    and performed the research at issue in this action at the University of Oxford.  ECF No. 83 at 25.

5    Because it is undisputed that California has an interest in the litigation, this factor weighs against

6    dismissal.

7                          **b.        The court's familiarity with the governing law**

8          Unless a federal statute that requires venue in the United States district courts is implicated,

9    a court need not make a choice-of-law determination for the purpose of deciding a *forum non*

10   *conveniens* motion.  *Leetsch v. Freedman*, 260 F.3d 1100, 1103 n.1 (9th Cir. 2001) ("The district

11   court was not required to make a choice of law determination, because this case did not involve a

12   statute requiring venue in the United States.").  This is because "[t]he purpose of a choice of law

13   inquiry in a *forum non conveniens* analysis is to determine if one of these statutes would apply," as

14   the action cannot be dismissed on *forum non conveniens* grounds if one of those statutes applies.

15   *Lueck*, 236 at 1148.  "Where no such law is implicated, the choice of law determination is given

16   much less deference on a *forum non conveniens* inquiry."  *Id.*

17         Here, no party contends that a federal statute that requires venue in the United States is

18   implicated; accordingly, making a definitive choice-of-law determination is not necessary to

19   resolve the present motion.  The parties do not disagree as to the law that governs Bluestar's

20   claims against Dr. Song.  Bluestar argues that, because the Consulting Agreement has a choice-of-

21   law provision selecting California law, its claims against Dr. Song are governed by California law.

22   ECF No. 88 at 28.  Dr. Song does not argue otherwise.  *See* ECF No. 83 at 25; ECF No. 91 at 18-

23   19.  Because this Court has greater familiarity with California law than a court in the United

24   Kingdom, and because no party argues that this Court would have to apply foreign law if this case

25   were litigated here, this factor weighs against dismissal.  *Cf. Lueck*, 236 F.3d at 1148 n.6 (noting

26   that, where New Zealand law was likely to apply to the claims, the governing law factor weighed

27   in favor of dismissal).  The Court does not weigh this factor heavily, however, given that choice-

28   of-law considerations cannot be given much deference where a federal statute requiring United

1    States venue is not implicated.  *See Lueck*, 236 F.3d at 1148.

### c.    The burden on local courts and juries

Dr. Song argues that the burden on this Court and the local jury pool is not justified by "Bluestar's dispute with an English defendant with no current ties to California on matters that primarily occurred in the United Kingdom."  ECF No. 83 at 25.  Bluestar, on the other hand, argues that this Court and a local jury would not be substantially burdened by this litigation because California has an interest in the action for the reasons discussed above and this Court is familiar with California law.  ECF No. 88 at 28.  Bluestar also contends that a court and jury in the United Kingdom would be substantially burdened by having to research, understand, and apply California law.  *Id.*

Here, any burden on this Court and the local jury pool would be justified because this case has a significant connection to California, as it involves claims brought by a resident of California that arise out of a contract that was partially negotiated and performed in California.[21]  On the other hand, the United Kingdom also has an interest in this action because it involves one of its residents.  Thus, any burden on a United Kingdom court and jury of would be justified by that interest.  This factor is, therefore, neutral.

### d.    Congestion in the court

Neither side addresses this factor.  Accordingly, it is neutral.

### e.    The costs of resolving a dispute unrelated to a particular forum

Neither side addresses this factor.  Thus, it is neutral.

### f.    Conclusion as to public factors

Two of the public factors weigh against dismissal, three are neutral, and none of them

---

[21] This distinguishes the claims here from those in *Dibdin*, 2013 WL 327324, at *7, which Dr. Song cites for the proposition that the burden on this Court and the local jury pool is not justified.  In *Dibdin*, the court held that the United Kingdom should bear the burden and costs of adjudicating claims that arose out of events and conduct that allegedly damaged the plaintiff's reputation because they took place in England and did not have a significant connection to California.  The claims in *Dibdin* did not involve the alleged breach of a contract that was partially negotiated and performed in California and to which a California resident was a party, as the claims here do.

weighs in favor of dismissal.  Accordingly, on balance, the public factors weigh against dismissal.

### 4.     Balancing of private and public factors

The private factors are neutral, and the public factors weigh against dismissal.  Accordingly, the balance of the private and public factors does not weigh strongly in favor of dismissal, which is what Dr. Song would need to show to prevail on his motion to dismiss on the ground of *forum non conveniens*.  The Court, therefore, DENIES Dr. Song's motion.

### CONCLUSION

For the foregoing reasons, the Court DENIES Dr. Song's motion to dismiss for lack of personal jurisdiction and on the ground of *forum non conveniens*.

The Court GRANTS Ludwig's motion to dismiss the claims against it for lack of personal jurisdiction and DENIES AS MOOT the motions to dismiss it brings in the alternative.

The Court DENIES AS MOOT Bluestar's motion to seal, ECF No. 89, because Dr. Song and Ludwig, the parties who designated the material subject to the motion to seal as confidential, do not oppose the filing on the public docket of the material subject to the motion to seal.

The Clerk shall terminate docket numbers 82, 83, and 89.

A case management conference will be held on July 11, 2023 at 2:00 p.m.  An updated joint case management statement is due July 5, 2023.

**IT IS SO ORDERED.**

Dated:  May 25, 2023



_____
JON S. TIGAR
United States District Judge